ORAL ARGUMENT REQUESTED

No. 14-1432

═══════════════════════════════════════════

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————————

JAMES P. TENNILLE, *et al.*,

Plaintiffs-Appellees

v.

THE WESTERN UNION COMPANY, *et al.*,

Defendants-Appellants

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO, No. 1:09-cv-00938
THE HONORABLE JOHN L. KANE

———————————————

BRIEF FOR APPELLANTS

———————————————

Jason A. Yurasek
PERKINS COIE LLP
4 Embarcadero Center, Suite 2400
San Francisco, CA 94111
Telephone: (415) 344-7000
jyurasek@perkinscoie.com

Jess A. Dance
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone: (303) 291-2300
jdance@perkinscoie.com

Charles G. Cole
Thomas M. Barba
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Telephone: (202) 429-3000
ccole@steptoe.com
tbarba@steptoe.com

*Counsel for Appellants The Western Union Company
and Western Union Financial Services, Inc.*

═══════════════════════════════════════════

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Federal Rule of Appellate Procedure 26.1, Defendants state that Western Union Financial Services, Inc. is a wholly-owned subsidiary of First Financial Corporation, which in turn is a wholly-owned subsidiary of The Western Union Company.  Capital Research Global Investors owns more than 10% of The Western Union Company.

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES..........................................................................
iiiii

STATEMENT OF RELATED CASES ................................................. vii

GLOSSARY............................................................................ viii

STATEMENT OF JURISDICTION.........................................................1

ISSUES PRESENTED...........................................................................2

STATEMENT OF THE CASE................................................................2

STATEMENT OF FACTS ....................................................................4

   I.  CASE BACKGROUND................................................................4

      A.  The Plaintiffs' claims.................................................6

      B.  Relevant procedural history .................................................7

   II.  THE SETTLEMENT AGREEMENT .........................................8

   III. CLASS COUNSEL'S MOTION FOR ATTORNEYS' FEES AND
       COSTS ......................................................................12

SUMMARY OF ARGUMENT ...........................................................19

STANDARD OF REVIEW .................................................................21

ARGUMENT ...................................................................................24

   I.  THE DISTRICT COURT ERRED BY ASSESSING ATTORNEYS'
      FEES BASED ON FUNDS WHICH ALREADY BELONGED TO THE
      CLASS AND WERE NOT DISPUTED .....................................24

      A.  In a common fund case, attorneys' fees are assessed as a portion of
         the economic benefit that class counsel's efforts have created for the
         class .......................................................................24

i

B.  The District Court erred in counting the full value of the Settlement Fund as a common benefit, because refunds were already available to the Class ............................................................................... 27

C.  Despite finding that the Class had an undisputed right to its principal, the District Court set out an erroneous benefit theory that had no evidentiary foundation ............................................................... 32

D.  The District Court did not find a measurable benefit from better notice ......................................................................................... 35

II.  THE PERCENTAGE OF THE FUND USED BY THE DISTRICT COURT IN CALCULATING THE FEE AWARD WAS UNREASONABLE GIVEN THE FUND'S SIZE ........................................ 40

A.  Because of the Class Settlement Fund's large size, 30% is an unreasonable and excessive initial fee determination ........................... 40

B.  The $40 million fee award does not survive a lodestar analysis ........... 48

C.  The $40 million fee award does not survive a *Johnson*-factor analysis ................................................................................... 52

CONCLUSION ..................................................................................... 56

STATEMENT ON ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

ADDENDUM PURSUANT TO 10TH CIR. R. 28.2(A)

Recommendation of United States Magistrate Judge (Dec. 31, 2013) ... Add. 1

Order Modifying Magistrate Judge's Recommendation re Attorney Fees (Sept. 23, 2014) ........................................................................... Add. 34

Amended Order Modifying Magistrate Judge's Recommendation re Attorney Fees (Oct. 15, 2014) ............................................................ Add. 44

Order (Oct. 15, 2014) ............................................................................Add. 55

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aguinaga v. United Food & Commercial Workers Int'l Union*,
  993 F.2d 1480 (10th Cir. 1993) ........................................................... 22

*Allapattah Services, Inc. v. Exxon Corp.*,
  454 F. Supp. 2d 1185 (S.D. Fla. 2006) ................................................. 47

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
  421 U.S. 240 (1975) ............................................................................ 25

*Am. Soda, LLP v. U.S. Filter Wastewater Grp.*,
  428 F.3d 921 (10th Cir. 2005) .............................................................. 1

*Been v. O.K. Indus., Inc.*,
  No. CIV-02-285, 2011 WL 4478766 (E.D. Okla. Aug. 16, 2011) .................... 49

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ..................................................................... passim

*Brown v. Phillips Petro. Co.*,
  838 F.2d 451 (10th Cir. 1988) ....................................................... passim

*Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*,
  3 F.3d 1568 (D.C. Cir. 1993) ............................................................... 23

*Gottlieb v. Barry*,
  43 F.3d 474 (10th Cir. 1994) ......................................................... 19, 43

*Hall v. Cole*,
  412 U.S. 1 (1973) ............................................................................... 24

*In re Boston Chicken, Inc. Sec. Litig.*,
  Nos. 97-cv-1308 et al., 2006 WL 2338188 (D. Colo. Aug. 10, 2006) .............. 50

*In re Cendant Corp. PRIDES Litig.*,
  243 F.3d 722 (3d Cir. 2001) ................................................................. 44

*In re Copley Pharm., Inc.*,
  1 F. Supp. 2d 1407 (D. Wyo. 1998) .................................................. passim

iii

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ....................................................................49

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
   851 F. Supp. 2d 1040 (S.D. Tex. 2012)...............................................37

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
   517 F.3d 220 (5th Cir. 2008) ...............................................................23

*In re Hope 7 Monroe St. Ltd. P'ship*,
   743 F.3d 867 (D.C. Cir. 2014).............................................................42

*In re Miniscribe Corp.*,
   309 F.3d 1234 (10th Cir. 2002) .....................................................24, 51

*In re Prudential Ins. Co. Am. Sales Litig.*,
   148 F.3d 283 (3d Cir. 1998) .........................................................passim

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994) ...............................................................44

*Johnson v. Ga. Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974) .......................................................passim

*Jones v. Muir*,
   515 A.2d 855 (Pa. 1986)......................................................................29

*Lewis v. Wal-Mart Stores, Inc.*,
   No. 02-CV-0944, 2006 WL 3505851 (N.D. Okla. Dec. 4, 2006) ......................43

*Lucken Family Ltd. P'ship, LLLP v. Ultra Res., Inc.*,
   No. 09-cv-01543, 2010 WL 5387559 (D. Colo. Dec. 22, 2010).........................49

*Mann v. Reynolds*,
   46 F.3d 1055 (10th Cir. 1995) .....................................................22, 35

*Pearson v. NBTY, Inc.*,
   Nos. 12-1245 et al., 2014 WL 6466128 (7th Cir. Nov. 19, 2014)....22, 36, 37, 45

*Rosenbaum v. MacAllister*,
   64 F.3d 1439 (10th Cir. 1995) .....................................................passim

*Savoie v. Merchants Bank*,
  84 F.3d 52 (2d Cir. 1996) ..................................................................24

*Uselton v. Commercial Lovelace Motor Freight, Inc.*,
  9 F.3d 849 (10th Cir. 1993) ...........................................20, 43, 48, 52

*Vaszlavik v. Storage Corp.*,
  No. 95-B-2525, 2000 WL 1268824 (D. Colo. Mar. 9, 2000)...........................43

*Wolf v. Gen. Motors United Auto Workers Supp. Unemp't Benefit Plan*,
  569 F.2d 1266 (3d Cir. 1978) .............................................................25

## STATUTES

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1332(d)(2)(A) .....................................................................1

## RULES

Fed. R. Civ. P. 23(a)(3)....................................................... 1, 31-33

Fed. R. Civ. P. 23(d)(1)(B), (e)(1) ......................................................37

Fed. R. Civ. P. 23(h)(2).........................................................................42

## BOOKS AND ARTICLES

American Law Institute, *Principles of the Law of Aggregate Litigation*
  (2010)..................................................................................27, 49

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and
  Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) ................................ 41-42

Herbert P. Newberg, *Attorney Fee Awards* (1986)....................................42

Manual for Complex Litigation (Fourth) (2004) ...............................49, 55

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in
  Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248
  (2010)..................................................................................43

William J. Lynk, *Courts and the Plaintiffs' Bar: Awarding the Attorney's
  Fee in Class-Action Litigation*, 23 J. Legal Stud. 185 (1994) ..........................42

v

**MISCELLANEOUS**

Third Circuit Task Force, *Court Awarded Attorney Fees*,
    108 F.R.D. 237 (1985) ........................................................................42

## <u>STATEMENT OF RELATED CASES</u>

*Tennille v. The Western Union Company*, No. 11-1531 (10th Cir. filed Nov. 25, 2011) (appeal of The Western Union Company)

*Tennille v. The Western Union Company*, No. 13-1310 (10th Cir. filed July 22, 2013) (appeal of objector Sikora Nelson)

*Tennille v. The Western Union Company*, No. 13-1317 (10th Cir. filed July 26, 2013) (appeal of objector Paul Dorsey)

*Tennille v. The Western Union Company*, No. 13-1378 (10th Cir. filed Sept. 11, 2013) (appeal of objector Sikora Nelson)

*Tennille v. The Western Union Company*, No. 13-1456 (10th Cir. filed Nov. 5, 2013) (appeal of objector Paul Dorsey)

*Tennille v. The Western Union Company*, No. 14-1424 (10th Cir. filed Oct. 16, 2014) (appeal of objector N. Albert Bacharach

# **GLOSSARY**

CSF:        Class Settlement Fund

TWUC:       The Western Union Company

WUFSI:      Western Union Financial Services, Inc.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A). This action was filed under Federal Rule of Civil Procedure 23, the amount in controversy exceeded $5,000,000, exclusive of interest and costs, and at least one member of the Class was diverse from Western Union.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.  On September 23, 2014, the District Court issued an order granting Class Counsel's motion for attorneys' fees.  Add. 34-43 [App. 735-44].[*]  On October 15, 2014, the District Court amended its previous order, Add. 44-54 [App. 786-96], and issued an order that reduced its attorneys' fee award to a sum certain, Add. 55-56 [App. 797-98]. That order was final and appealable.  *See Am. Soda, LLP v. U.S. Filter Wastewater Grp.*, 428 F.3d 921, 924 (10th Cir. 2005).  Western Union appealed these orders on October 20, 2014.  App. 799-801.

---

[*] The orders of the District Court under review are included in an Addendum to this brief.  Citations to the pages of the Addendum take the form "Add. ___." Citations to the Appellants' Appendix take the form "App. ___."

1

## ISSUES PRESENTED

1.  Did the District Court err in awarding attorneys' fees to Class Counsel based upon a percentage of the Class Settlement Fund, when the Fund consisted of monies to which the Class members already had an undisputed right and the District Court had no evidentiary basis for its theory of the benefit obtained by Class Counsel?

2.  Was the District Court's attorneys' fee award of 30% of the $135 million Class Settlement Fund excessive, when Class Counsel did not secure these monies for the Class and awards from similarly sized funds are much lower?

## STATEMENT OF THE CASE

This appeal challenges the largest reported award of attorneys' fees in the history of the Tenth Circuit.  The Western Union Company ("TWUC") and its operating subsidiary, Western Union Financial Services, Inc. ("WUFSI") (together "Western Union"), defendants in a recently settled class action, contend that the District Court substantially overvalued the benefits secured by the lawsuit and awarded a percentage of the purported recovery (30%) unsupported in law and fact.  The result was a $40 million award unjustified on the record.

The underlying class action concerned Western Union's procedures for handling "unredeemed" money transfers – those not picked up by their intended recipients or reclaimed by their senders.  Historically, if the sender did not seek a refund of undelivered funds, Western Union held the funds, charging a small administrative fee, until they escheated to the appropriate state.  Just prior to

2

escheat, in accordance with state law, Western Union gave notice to the senders that the funds had not been claimed and were still available for refund.

The putative Class Representatives, four customers of Western Union, received their refunds (less administrative fees), but claimed that the company should have notified them sooner.  They contended that earlier notice would have enabled them to avoid the administrative fees and earn interest on the principal. They alleged that Western Union wrongfully kept the interest earned on funds held prior to escheat.  Notably, because state law provides that the unredeemed funds belonged to the senders and not to Western Union, Plaintiffs did not and could not allege misappropriation of the principal amounts.

Shortly after substantive discovery began, the parties settled.  Western Union agreed to place all unredeemed customer funds that it was holding into a Class Settlement Fund (defined below), from which refunds, interest, the settlement administrator's costs, and attorneys' fees could be paid.  Any funds left over would be placed in a *cy pres* fund which would be distributed to the states that claimed the right to escheat the funds or, if the states asserted claims against Western Union for money in the Class Settlement Fund, used to indemnify Western Union.

After preliminary approval of the settlement, Class Counsel moved for attorneys' fees, seeking 30% of the entire Class Settlement Fund, including the

undisputed principal amounts.  Western Union objected, and the matter was

referred to a Magistrate Judge (Tafoya, J.), who recommended that Class Counsel

be awarded $22 million in fees.  Add. 1-33 [App. 561-93].  Upon objection by

Class Counsel, the District Court modified her recommendation and granted Class

Counsel's motion, awarding 30% of the entire $135 million Class Settlement Fund

(*i.e.*, $40 million).  Add. 34-43, 55-56.  In effect, the Class members gave up 30%

of funds that had always indisputably belonged to them to finance a windfall for

their lawyers.  Because the award could affect the residue available to indemnify

Western Union and is excessive under any measure, Western Union appeals.


## STATEMENT OF FACTS

### I.     CASE BACKGROUND

Western Union's operating subsidiary, WUFSI, is a financial services

company that successfully completes hundreds of millions of consumer money

transfers each year for customers around the world.  App. 334.  This case concerns

the very small percentage of those money transfers – less than 1% of transactions

in the United States – that are not picked up by the intended recipient or sender.

App. 862 & n.25.

In the typical Western Union transaction, a customer goes to a Western

Union agent (or website), completes a form that identifies the intended recipient,

4

and tenders the principal and a fee. Shortly thereafter, the funds become available to the intended recipient at another Western Union location.

The customer agreement prescribes what happens if the funds are not picked up: "REFUNDS OF PRINCIPAL AMOUNT and cancellation of the money transfer will be made upon written request of the Sender if payment to the Receiver has not yet been made at the time the request is processed by Western Union." App. 90. The agreement also describes the refund procedure: "If you want a refund, you must mail or deliver your written request to Western Union" at a specified address. *Id*. Where a money transfer has not been picked up in a year, the agreement specifies that Western Union will charge an administrative fee of $0.50 per month, up to a total of $42. *Id*. The agreement includes no promise of interest.

If there has been no refund within a certain period of time determined by state law, the unredeemed customer funds escheat to the state where the money transfer was initiated. Before escheat, Western Union notifies the customer that escheat is imminent, Add. 2, and that a refund can be still claimed. Historically, approximately 15% of Western Union customers respond to these pre-escheatment notices. App. 277-78 & n.7. Under most states' laws, the owner has a continuing right to claim the funds after they have escheated. App. 301.

5

### A.     The Plaintiffs' claims

Plaintiffs are Western Union customers who received refunds, less the administrative fees authorized in the contract.  App. 59-60 [¶¶ 23, 28, 32, 37].  In two consolidated cases, Plaintiffs alleged that "What Western Union should do is promptly notify customers, *i.e.*, Class members, who have entrusted Western Union with their funds, and inform them their transfer was not completed."  App. 57.  Specifically, Plaintiffs allege that Western Union (1) failed to notify customers soon after their attempted money transfers went unredeemed; (2) improperly held those unredeemed funds to earn interest for itself; and (3) improperly held the customers' administrative fees for the money transfers.  Add. 2; App. 55-56, 61-64, 70-73 [¶¶ 7, 40, 69, 78, 85].

Throughout the litigation, Western Union maintained that Plaintiffs do not have a viable claim.  Western Union fulfilled its duties under the express contract, which did not require it to provide immediate notice that a money transfer had not been claimed.  App. 89-91.  Western Union always provided such notice prior to escheat and granted refunds upon request for the unclaimed money transfer prior to the date of escheatment, pursuant to state law.  App. 70-72 [¶¶ 68, 77, 83]; App. 298-301.  No part of the contract granted customers the right to interest on their money transfer funds.  App. 89-91.  Further, the contract specifically permitted Western Union to charge the administrative fee.  *Id.*

6

**B.     Relevant procedural history**

Plaintiff Tennille filed a putative class action against TWUC on April 23, 2009.  App. 9 [Dkt. No. 1].  One year later, Plaintiff Smet filed a second, related class action complaint.  The District Court consolidated the *Tennille* and *Smet* Cases.  App. 11 [Dkt. No. 20].  On March 11, 2011, Plaintiffs filed a Second Amended Consolidated Class Action Complaint that added WUFSI as a defendant.  App. 53-82.

Because Plaintiffs' contracts with WUFSI provided that any disputes arising out of their transactions would be resolved by arbitration, WUFSI and TWUC moved to compel individual arbitration of the named Plaintiffs' claims and to stay the action pending arbitration.  App. 15 [Dkt. No. 56].  Thereafter, the parties engaged in limited discovery related only to the arbitration motion.  App. 18, 23 [Dkt. Nos. 74, 109].  After the District Court denied the arbitration motion, App. 27 [Dkt. No. 139], Western Union appealed, *id.* [Dkt. No. 141].  This Court then granted a stay of the District Court proceedings pending the appeal.  App. 92-93.

At the time, Plaintiffs had not moved to certify the Class and had not taken substantive depositions.  Nor had Western Union answered the Second Amended Complaint.

## II.     THE SETTLEMENT AGREEMENT

While the appeal of the arbitration motion was pending, the parties engaged in settlement discussions.  On November 16, 2012, the parties entered into a Stipulation and Agreement of Compromise and Settlement (the "Settlement Agreement"), which contemplates resolution through a nationwide class settlement.  The Settlement Agreement provides four types of relief for those customers who initiated certain money transfer transaction in the United States between January 1, 2001 and January 3, 2013 (the "Class").  App. 94-141.

First, Western Union will deposit into a new trust account (the "Class Settlement Fund" or "CSF") the Class members' unclaimed money transfer funds still being held on the date of Final Approval, less the administrative fees and charges specified in Class members' contracts and/or permitted by state statutes. Add. 3; App. 102-03 [§ 2.A.3].  The settlement administrator will pay out of the Class Settlement Fund:

(i) valid claims for refunds of Class members' unclaimed funds less administrative fees and charges;

(ii) the settlement administrator's fees and expenses;

(iii) Class Representative awards in the amount of $7,500 each; and

(iv) Class Counsel's attorneys' fees and expenses.  App. 101-02, 105, 121-22 [§§ 2.A.2, 2.C.1, 4.A, 5.A].  If, as a result of attorneys' fees or other expenses,

there is "not sufficient money in the Class Settlement Fund to pay in full valid claims, then valid claims will be paid *pro rata*."  App. 103 [§ 2.A.4].

Second, Class members whose funds have already escheated to a state as of the date of Final Approval will be mailed an Escheat Recovery Form and Instructions on how to recover money from the appropriate state holding their escheated funds.  App. 104 [§ 2.B.1].

Third, upon submission of a valid claim form, all Class members will receive a lump sum amount equal to the amount of interest that accrued on those funds while they were held by Western Union.  App. 104-07 [§§ 2.B.2, 2.C.2, 2.C.5].  The amount of interest that accrued on unclaimed funds is estimated at $19.056 million.  Add. 4; App. 323.

Fourth, the Settlement Agreement provides for prospective injunctive relief. Absent a contrary request from law enforcement or a prohibiting law or court order, Western Union will modify its policies and practices to notify customers within 60-90 days that their money transfers have not been redeemed.  App. 107-08 [§ 2.D.1].

If there are any monies remaining in the Class Settlement Fund after full payment of all valid claims, administrator's fees, Class Representative incentive awards, and attorneys' fees and expenses, then those monies will be deposited into a *cy pres* fund.  App. 501-02.  Under the terms of the District Court's Final

9

Approval Order, these funds will be distributed to the states in the same proportion as if they had been subject to escheat.  *Id.*

At the same time, the Final Approval Order provides for extinguishment of the states' claims for escheat.  App. 503.  It further provides that, before receiving any monies from the *cy pres* fund, each state must release Western Union, Class Counsel and the Claims Administrator from "any and all escheatment liabilities, claims, causes of action, damages, costs, or demands."  App. 502; *see also* App. 123, 126-29 [§§ 6.B, 10.B, 10.D].

In addition, the Final Approval Order states that if any state, territory, district or U.S. jurisdiction either "(1) does not sign the Release within 12 months of the date of creation of the *cy pres* fund; or (2) asserts a claim against Western Union relating to the funds in the Class Settlement Fund, those funds shall be deposited into a separate fund."  App. 502-03.  These funds may then be used to pay such claims or judgments against, or corresponding litigation costs incurred by, Western Union.  Specifically,

> Upon an adequate showing by Western Union, the Court shall direct payment from the separate fund, up to the proportionate amount that would have been paid to the state, territory, district or U.S. jurisdiction . . ., [to be used to satisfy any claims or judgments, or any costs or fees associated with any claim or judgment against Western Union or the Released Parties.

*Id.*

10

On January 3, 2013, the District Court preliminarily approved the Settlement Agreement.  App. 142-52.  Several Class members objected to the Settlement, *see, e.g.*, App. 34 [Dkt. No. 213], and fourteen state attorneys general filed an *amicus* brief opposing the settlement and the amount of attorneys' fees, App. 424-53.

Effective June 25, 2013, the District Court approved the Settlement Agreement, and entered the Amended Final Judgment and Order of Dismissal (the "Final Approval").  App. 490-504.  Class members Sikora Nelson and Paul Dorsey appealed the Final Approval.  (Case Nos. 13-1310 and 13-1317.)  Their appeals were briefed and heard by a panel of this Court (Lucero, Ebel, and Holmes, JJ.) on March 18, 2014.  The panel's decision is pending.  The Settlement Effective Date has been deferred pending appeal.

In the meantime, some states have indicated that they do not intend to sign the Release and will instead pursue claims against Western Union to recover funds that would eventually escheat if they were not deposited into the Class Settlement Fund.  On November 6, 2013, Western Union received a letter from the Attorney General of California, on behalf of the California Controller.  App. 697, 701-04.  The California letter asserted that Western Union's deposit of California residents' unclaimed funds "into the Class Settlement Fund will not satisfy Western Union's obligations to report and remit funds under the California [Unclaimed Property

Law]," and that "Western Union will remain liable to the State of California for the California funds."  App. 701-04.

Subsequently, a representative from the District of Columbia informed Western Union's counsel that he would advise the District not to accept the *cy pres* funds and that "several" other states will likely bring enforcement actions against Western Union after it funds the Class Settlement Fund.  App. 697-98.  Also, representatives from Pennsylvania's Treasury Department told Western Union's counsel that Pennsylvania would not sign the Release and would accept no less than 100% of the funds that would have escheated to Pennsylvania absent the Final Approval.  App. 698.

Accordingly, on March 19, 2014, Western Union filed a motion to extend the Settlement Effective Date in the District Court.  The motion sought to extend the date until after the threatened enforcement actions by California, Pennsylvania, and the District of Columbia are favorably resolved, such that none of the disputed funds are subject to escheat by those jurisdictions.  App. 668-94.  That motion is pending.

## III.   CLASS COUNSEL'S MOTION FOR ATTORNEYS' FEES AND COSTS

On April 30, 2013, after the settlement's preliminary approval, Class Counsel filed their motion for attorneys' fees and costs, requesting 30% of the Class Settlement Fund's value.  App. 165-67.  When Class Counsel submitted their

12

motion for attorneys' fees, the Class Settlement Fund was estimated to be approximately $180 million.  App. 102-03 [§ 2.A.3].  On June 24, 2013, in response to the District Court's request for an updated estimate, Western Union estimated the Class Settlement Fund at approximately $135 million.  App. 488-89.

Western Union objected to Class Counsel's fee request.  App. 289-319. Western Union explained that the settlement did not *create* a right to refund, either from the company or any state, so that the return of these funds did not constitute new value for the Class.  App. 298-302.  Western Union pointed out that the only real economic benefit created by the Settlement Agreement for Class members was the ability to collect up to $19 million in interest.  App. 291, 302-03.  Western Union urged the Court to require Class Counsel to produce their lodestar, and, if the award were made on a percentage basis, to defer a fee award decision until the claims process concluded.  App. 307-08.

On June 24, 2013, the District Court referred Class Counsel's motion to the Magistrate Judge.  App. 38 [Dkt. No. 252].  The Magistrate Judge ordered Class Counsel to submit evidence of their lodestar calculation.  App. 506-07.  Class Counsel submitted matrices claiming that the six plaintiffs' firms had a lodestar of $8,076,308 for work done to date and would incur additional fees of $1,375,000 in connection with pending appeals and settlement administration.  App. 519-527, 527A.  Class Counsel asserted that its fee request of 30% of the Class Settlement

13

Fund was "reached by applying a multiplier of between 4 and 6 to the current/future combined lodestar of $9 million."  App. 515.

Western Union responded with a detailed critique of the hours and rates used in computing the $9 million lodestar.  App. 528-43.  For example, it noted that there was undoubtedly duplication among the 30 partners and associates who were reported to have worked on the case.  App. 537.  Western Union also argued that the multiplier was well over the standard acceptable range, and "would result in a fee equal to more than $3,300 per hour for every attorney, paralegal, and administrative staffer who worked on the case."  App. 531-32.  Western Union included a sworn statement that the two firms representing the defendants in this action had incurred, to date, only $3.1 million in fees and expenses.  App. 544-45.

On December 31, 2013, the Magistrate Judge submitted a Recommendation that Class Counsel be awarded attorneys' fees totaling $22,946,208.  Add. 1-33. Initially, she found that Western Union did not have standing to object to the motion for attorneys' fees, because its payment of the unredeemed customer funds into the Class Settlement Fund was not contingent on the amount of attorneys' fees awarded.  Add. 13.  However, she recognized that "[t]he court does, of course, have an independent duty to review and approve Class Counsel's proposed fee award."  *Id.*  For that reason, though the Magistrate Judge did not "directly

14

address" Western Union's objections, it did "raise and consider" similar arguments.  Add. 13-14.

The Magistrate Judge rejected Class Counsel's request to base the fee award on the value of the entire Class Settlement Fund.  She explained that "basing a fee award on the funds in the CSF trust account substantially overestimates the benefit conferred upon the Class by Class Counsel's efforts in creating the Class Settlement Fund."  Add. 15.  She found that "Plaintiffs have *never* alleged that Western Union wrongfully withheld unredeemed money transfers when customers requested they be refunded."  *Id.* (emphasis in original).  Thus, including those unredeemed funds in the value to Class members "would unreasonably inflate the economic benefit of this relief to the detriment of the class."  Add. 18.

Moreover, "[b]asing any award to Class Counsel on the funds in the CSF trust account alone . . . would actually leave class members in a *worse* position than before this litigation commenced," because they may be forced to accept *pro rata* reductions in their unredeemed transfer funds if Class Counsel were awarded 30% of the Class Settlement Fund.  Add. 16.  The Magistrate Judge therefore "decline[d] to find that the Class Settlement Fund constitute[d] the 'common fund' in this action."  *Id.*

The Magistrate Judge found the primary benefits of the settlement were (a) the $19 million in interest payments to Class members; and (b) the present value of

prospective injunctive relief, which she calculated as $45,560,596.  Add. 25.

Beginning with that number, she applied the percentage-of-the-fund method, and

gave Class Counsel 35% ($22,946,208) as a fee.  The Magistrate Judge analyzed

the *Johnson* factors, ultimately finding that a fee of $22 million was reasonable.

Add. 25-30.  Finally, she found that $22 million was acceptable in light of the

asserted lodestar, because "courts typically award multipliers of 2 to 3 times the

lodestar."  Add. 29-30.  She did not examine the basis for the lodestar.  *Id.*

Both Class Counsel and Western Union filed objections.  App. 594-637.

Western Union argued that the fee award depended on "the inclusion in the

common fund of a speculative, unsupported and unreliable estimate of the

purported value of prospective injunctive relief on future Western Union

Customers" and an improper fee percentage of 35%.  App. 610, 617-32.  Western

Union explained that it had standing to object because it had a financial interest in

any undistributed funds in the Class Settlement Fund, which could be used to

protect Western Union from any potential claims by the states.  App. 632-34.

On July 8, 2014, the District Court ordered an oral argument on attorneys'

fees and asked the parties to submit additional information.  App. 707-13.  The

District Court explained, "I am convinced the [Class Settlement Fund] conferred a

real and tangible benefit on the Class that individual Class members would have

foregone but for Counsel's efforts.  This benefit is categorically different from the

unclaimed transfer funds themselves, and I agree with the magistrate judge that a fee request based on a percentage of those funds is excessive." App. 712. The District Court asked for ways to value the notice to the Class, apart from the value of the Fund. App. 710.

The District Court also stated that the injunctive relief contained in the settlement, "by definition, does not benefit the *Class* of Western Union customers that is defined and certified as the operative Class in the Final Settlement Agreement." *Id.* (emphasis in original). The Court therefore asked the parties to provide the evidentiary basis for the assertions that current Western Union customers will remain Western Union customers and that some percentage of them will benefit from the injunctive relief. App. 710-11.

In response, Western Union submitted several declarations from its employees and its expert, Dr. Steven Shavell, calculating the total annual value to Class members of injunctive relief. App. 854-66. Dr. Shavell calculated the number of WUFSI customers likely to be repeat customers and the likelihood that any of them would again experience an unredeemed transfer. He determined that the injunctive relief's total value was a very small fraction of the amount that Class Counsel's expert (Johnson) had calculated. App. 861. Class Counsel submitted no additional evidence regarding the value of injunctive relief.

On September 23, 2014, the District Court issued its Order Modifying

Magistrate Judge's Recommendation re Attorney Fees.  Add. 34-43.  It agreed with

the Magistrate Judge's key findings, but nonetheless granted a fee almost double

the recommended fee.

After reviewing the information the parties submitted on the injunctive

relief's total value, the Court held that it is "folly [to] attempt[ ] to reduce to a

dollar amount the present value of the prospective relief obtained in the

Settlement."  Add. 42.  Instead, in an about-face from its July 8, 2014 Order, the

District Court accepted the entire value of the Class Settlement Fund as the benefit

conferred by Class Counsel.  The District Court agreed that the Magistrate Judge

was "technically correct" in finding that the monies in the Class Settlement Fund

had always belonged to the Class members, but held that this view did not

"recognize the practical effect" of the actions taken by Plaintiffs' counsel.  Add.

41.  In his view, the Settlement enabled Class members to avoid the "detailed

requirement," projected "delays" and "cost[s]" of seeking a refund directly from

the company.  *Id.*  The Court cited no evidence for any of these assumptions.

The Court then ruled that Class Counsel should receive 30% of the Class

Settlement Fund.  Add. 42.  The Court did not discuss any comparable cases in

which class counsel obtained 30% of a fund close in size to $135 million.  The

Court said it was persuaded by Class Counsel's expert declaration on the *Johnson*

18

factors and did not address the lodestar calculation.  The Court did not address the

Magistrate Judge's recommendations regarding Western Union's standing.

On October 15, 2014, the District Court amended its order to clarify the

description of the Class Settlement Fund in footnote 1.  Add. 44-54.  It then issued

an order awarding a sum certain, $40,571,759.70, in attorneys' fees.  Add. 55-56.

On October 20, 2014, TWUC and WUFSI appealed.  App. 799-801.

On October 15, 2014, Class member Albert N. Bacharach filed a separate

Notice of Appeal.

## SUMMARY OF ARGUMENT

The District Court's award of attorneys' fees to Class Counsel must be

reversed.  In a case in which attorneys' fees are assessed as a percentage of the

common benefit to the class, a district court must analyze two overriding

questions.  First, what is the value of the economic benefit conferred upon the class

as a direct result of class counsel's actions?  *See Rosenbaum v. MacAllister*, 64

F.3d 1439, 1445-46 (10th Cir. 1995); *In re Copley Pharm., Inc.*, 1 F. Supp. 2d

1407, 1412 (D. Wyo. 1998) (Brimmer, J.).

Second, in light of the common benefit to the class, what is a reasonable

percentage fee?  *See Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994); *Copley*,

1 F. Supp. 2d at 1412 ("The second step in a percentage of the fund analysis is an

initial determination of the appropriate percentage to award.").  After making an

initial fee determination, the district court must determine whether it is reasonable by using "the twelve factors originally developed for statutory fee determinations in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)." *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 853 (10th Cir. 1993). In this Circuit, even when applying the percentage of the fund methodology, district courts use the lodestar method "as a rough crosscheck of the result reached with the percentage of the fund method and the *Johnson* factors." *See, e.g.*, *Copley*, 1 F. Supp. 2d at 1415 n.4.

Here, the District Court committed reversible error in answering both questions. First, the District Court misperceived the size of the common benefit procured by Class Counsel. The common fund on which the District Court based its award of attorneys' fees – the Class Settlement Fund – consisted of Class members' funds whose ownership has never been disputed. The settlement did not confer an economic benefit simply by returning to the Class funds to which its members already had an undisputed right to refund. The District Court appropriately recognized that Class Counsel did not secure these funds, but nonetheless found a "practical" benefit from refund through the class settlement. This benefit lacked any evidentiary foundation, and it certainly did not equal the value of the entire CSF. To the extent that the District Court relied on the value of

20

notice under the settlement, this benefit was speculative and could be measured only after notice was given and the number of claims could be measured.

Second, the District Court chose a percentage – 30% of the $135 million CSF – that far exceeded the bounds of reasonableness. No case within this Circuit has ever awarded 30% of a fund greater than $100 million. The circumstances here – with a settlement before substantive discovery and trial – would not justify it. This is confirmed by a lodestar cross-check. Even accepting at face value Class Counsel's lodestar of $9 million, their $40 million fee yields a multiplier greater than 4 – measurably higher than those this Court has reversed. Similarly, an analysis of the *Johnson* factors shows that the fee awarded here is excessive. It is not justified by the labor and time, the outcome, or results in similar cases.

The District Court was right when it initially "agree[d] with the magistrate judge that a fee request based on a percentage of [the unclaimed transfer] funds is excessive." App. 712. This Court should reverse and remand with instructions to award a fee based on the $19 million in interest obtained for the class and only those other benefits that can be "traced with some accuracy." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79 (1980).

## STANDARD OF REVIEW

A district court's award of attorneys' fees can be reversed for an abuse of discretion. *Aguinaga v. United Food & Commercial Workers Int'l Union*, 993

F.2d 1480, 1481 (10th Cir. 1993).  "A court has abused its discretion when it 'based its decision on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling.'"  *Mann v. Reynolds*, 46 F.3d 1055, 1062 (10th Cir. 1995) (citation omitted).  Under this standard, a court's "'legal analysis which provides the basis for the fee award is reviewable de novo.'"  *Aguinaga*, 993 F.2d at 1481 (citation omitted).

Where the fee is based on a common benefit to a class, the question of the degree to which the class has benefited is a question of law reviewed *de novo.  See Rosenbaum*, 64 F.3d at 1446.  Thus, a percentage fee award based on that common benefit must be reversed if the district court has improperly measured the benefit. *See id.*; *Pearson v. NBTY, Inc.*, Nos. 12-1245 et al., 2014 WL 6466128, at *2-9 (7th Cir. Nov. 19, 2014) (reversing fee award where common benefit had been exaggerated).

"[T]he percentage reflected in a common fund award must be reasonable; and . . . the district court must articulate specific reasons for fee awards to give [the Court of Appeals] an adequate basis to review the reasonableness of the percentage and thus the reasonableness of the fee award."  *Brown v. Phillips Petro. Co.*, 838 F.2d 451, 454 (10th Cir. 1988) (internal punctuation and citation omitted); *see also In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 229 (5th Cir. 2008) ("[T]he district court's findings and reasons must be 'complete enough to

22

assume a review which can determine whether the court has used proper factual criteria in exercising its discretion to fix just compensation.'" (citation omitted)).

Class counsel have an inherent conflict of interest when seeking fees out of the class recovery:  "[T]he conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery." *Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*, 3 F.3d 1568, 1573 (D.C. Cir. 1993) (internal punctuation and citations omitted).  Thus, this Court has held that "[t]he trial judge in a common fund case must 'act as a fiduciary for the beneficiaries' of the fund" in determining a "reasonable fee." *Brown*, 838 F.2d at 456 (citation omitted).

# ARGUMENT

## I.  THE DISTRICT COURT ERRED BY ASSESSING ATTORNEYS' FEES BASED ON FUNDS WHICH ALREADY BELONGED TO THE CLASS AND WERE NOT DISPUTED

### A.  In a common fund case, attorneys' fees are assessed as a portion of the economic benefit that class counsel's efforts have created for the class

The District Court's award was erroneous because it overstated the economic benefit secured by the settlement.  *See* App. 658-63.  Courts have "traditionally awarded attorneys' fees to the successful plaintiff when his representative action creates or traces a 'common fund,' the economic benefit of which is shared by all members of the class."  *Hall v. Cole*, 412 U.S. 1, 6 n.7 (1973).  Fees are assessed against the common fund because of the "perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense."  *Boeing*, 444 U.S. at 478. "'Jurisdiction over the [common] fund enables a court to prevent such inequity by assessing fees out of the entire fund, spreading the burden proportionately among those benefitted.'"  *In re Miniscribe Corp.*, 309 F.3d 1234, 1241 (10th Cir. 2002) (citation omitted).

To justify an award of attorneys' fees based on the common benefit to a class, class counsel must play a causal role in securing the claimed economic benefit.  *See Savoie v. Merchants Bank*, 84 F.3d 52, 57 (2d Cir. 1996) (actions of the party seeking to recover attorneys' fees must be "a substantial cause of the

benefit obtained"); *Wolf v. Gen. Motors United Auto Workers Supp. Unemp't Benefit Plan*, 569 F.2d 1266, 1268 (3d Cir. 1978) ("The common benefit exception anticipates, and is necessarily preceded by, a proven causal relationship between the efforts of counsel and the benefits allegedly derived therefrom.").  An award from a common fund may be granted only if:  (1) "the classes of persons benefited by the lawsuits 'were small in number and easily identifiable'"; (2) "'[t]he benefits could be traced with some accuracy'"; and (3) "'there was reason for confidence that the costs [of litigation] could indeed be shifted with some exactitude to those benefiting.'"  *Boeing*, 444 U.S. at 478-79 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 265 n.39 (1975)).

In light of these principles, this Court carefully reviews the purported economic benefit to a class and excludes benefits already available to the class members.  *See Rosenbaum*, 64 F.3d at 1445.  In *Rosenbaum*, the Court overturned an award of attorneys' fees to class counsel on the grounds that the benefits supposedly secured by the action were independently available to the alleged beneficiaries of the action.  The district court had awarded a $2.5 million fee in a corporate derivative class action based on relief purportedly benefitting the corporation (the beneficiary of the derivative action) and absent class members (the beneficiaries of the class action) in an amount equal to $15 million.  This Court scrutinized the purported benefits and rejected the district court's analysis as a

25

matter of law.  Notably, where the district court had placed some monetary value on certain purportedly new governance procedures addressed by the settlement, this Court discounted their value, reasoning that several of those procedures "were in place as a result of a prior separate lawsuit." *Id.* at 1446.  This Court further rejected the argument that the settlement had procured a valuable new capital infusion for the corporation by virtue of a provision allowing class members to buy new stock at a discount. *Id.* at 1446-47.  Even assuming the corporation needed new capital, "other avenues were open to the corporation to obtain capital." *Id.* at 1447.  The infusion of new capital brought about by the settlement was no "less costly or more valuable than raising the capital by another method."  Thus, any "special benefit" to the corporation resulting from the settlement "seem[ed] illusory." *Id.*

This Court is not alone in recognizing that benefits obtained by class counsel must be segregated from benefits otherwise available to the class.  In *In re Prudential Ins. Co. Am. Sales Litig.*, 148 F.3d 283, 336 (3d Cir. 1998), the district court had found that class counsel had achieved a better outcome than in a parallel action by state attorneys general, and so it attributed the settlement's full value to class counsel in considering an attorneys' fee award.  The Third Circuit vacated the award, stating that "[o]ur concern is not the number of enhancements created [on top of the AG Plan], but rather how to value the benefits created by class counsel.

26

The crux of this inquiry is distinguishing those benefits created by class counsel from the benefits created under the [AG] Plan." *Id.* at 338.

In light of this precedent, the American Law Institute instructs that relief the defendant was providing prior to the lawsuit should not be counted as a "benefit" to the class. American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.13 cmt. a, illus. 2 (2010). It gives an illustration of a company that had announced, prior to filing of a customer class action, a program of free technical support for defective computers. A settlement that confirms such pre-existing relief does not create any economic benefit for the class. Thus, such relief "cannot be used in evaluating the actual value of the settlement to the class" because it was available "regardless of whether any lawsuit was filed or settled." *Id.* It is this principle that should have governed the District Court's evaluation of the attorneys' fee request in this case.

### B. The District Court erred in counting the full value of the Settlement Fund as a common benefit, because refunds were already available to the Class

Here, the only monetary relief constituting a "special benefit" to the Class – one that was not already available to them, *Rosenbaum*, 64 F.3d at 1447 – was a promise to pay interest for the time that Class members were allegedly deprived of the use of their own funds. The parties agree that, if all of the Class members make claims under the settlement, the interest paid will amount to $19 million.

27

Western Union does not dispute that this is an economic benefit to the Class on which attorneys' fees may be based. But it falls well short of the $135 million CSF on which the Court based its award. To get to that inflated figure, the District Court considered amounts to which Class members were already entitled through Western Union's pre-existing notice and refund process. Those amounts, as the Magistrate Judge reasoned, *already belonged to the class members*. Add. 15-16.

The District Court's consideration of the entire CSF as the basis for the fee award therefore failed to account for the unique composition of that fund. In the typical common fund case, the successful plaintiff class recovers funds which are the subject of dispute. Thus, the benefit that "devolves with certainty upon" class members is that, "[o]nce the class representatives have established the defendant's liability and the total amount of damages, members of the class can obtain their share of the recovery simply by proving their individual claims against the judgment fund." *Boeing*, 444 U.S. at 479.

By contrast, this settlement, in large part, did not entail the recovery of such disputed funds. Rather, the vast bulk of funds placed into the settlement fund here were unredeemed money transfers that Western Union merely held until either reclaimed by the sender or escheated to the state. Unlike the typical common fund action, Western Union never disputed the senders' rights to a refund of any such monies, and indeed, its contract with the senders guaranteed such return upon

28

request.  Thus, the deposit of those funds into a class settlement fund did not create

any new economic benefit for the Class, since absent Class members that make a

claim on the settlement fund are merely getting their own, undisputed funds

returned to them – much as they would have if they had made a refund claim

directly to Western Union.  *See Jones v. Muir*, 515 A.2d 855, 859-60 (Pa. 1986)

(no common fund created when plaintiff's lawsuit merely altered the method of

collecting vehicle owners' fees for a Catastrophic Loss Trust Fund, but did not

create the fund itself, which had been established by statute).

Whereas in *Boeing*, class counsel "established the defendant's liability" for

the monies in question, 444 U.S. at 479, Plaintiffs cannot contend that they

"established the defendant's liability" for monies already subject to refund.  For

one thing, they did not even assert a cause of action respecting such liability.

Rather, the crux of each claim was that Western Union had failed to immediately

*notify* Plaintiffs that their transfers had gone unredeemed, and had therefore

collected interest and administrative fees on the otherwise undisputed principal

amounts:

- Count 1 – Violation of consumer protection laws for failing to notify customers of a transfer failure, using unredeemed transfers to generate interest, deducting an administrative charge, and failing to refund a transaction fee; the District Court dismissed this count, App. 68-70 & n.3;

- Count 2 – Unjust enrichment for charging an administrative fee and collecting interest on unclaimed transfer monies, App. 70-71;

- Count 3 – Conversion for failing to notify customers of a transfer failure, App. 71-72; and

- Count 4 – Breach of fiduciary duty for "failing to notify [customers] that their transfers were not completed, failing to use best practicable notice, failing to notify that their refund rights were triggered, and failing to provide a refund in full [because of the administrative fee]," App. 72-73.

The Magistrate Judge agreed that the focal point of the case was notice.  She observed, "Plaintiffs have *never* alleged that Western Union wrongfully withheld unredeemed money transfers when customers requested they be refunded."  Add. 15 (emphasis in original).  In fact, far from alleging that Western Union had wrongfully denied valid claims for a refund of principal, Plaintiffs admitted that they could have collected their unredeemed transfers at any time.  App. 69 [¶ 64].  Again, the Magistrate Judge agreed:  "[R]egardless of the outcome of this litigation, class members always had a right to a refund of the dollar value of their uncompleted money transfers (less contractually agreed-upon administrative fees) from either Western Union or their escheatment authority."  Add. 15.  Plaintiffs merely alleged that Western Union's actual notice process – by which it notified Class members when their money was about to escheat – was insufficient.

This focus on notice is required by the facts.  Western Union's contract with its money transfer customers clearly sets out their right to a refund if a transfer goes unredeemed:

REFUNDS.  REFUNDS OF PRINCIPAL AMOUNT and cancellation of the money transfer will be made upon written request of the Sender

30

> if payment to the Receiver has not yet been made at the time the request is processed by Western Union. . . . Refunds will be made within 45 days of receipt of a valid written request from the Sender.

App. 90. Significantly, Plaintiffs never alleged a breach of their contracts. Indeed, according to the Complaint, each of the Class Representatives obtained a refund before this action commenced. App. 59-60. This case therefore never could have been certified as a class action based on a refusal to refund principal, since class representatives may only seek relief where their claims "are typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3).

Nor is there a common benefit from the Settlement's creation of the CSF trust account. This was merely an administrative convenience. It did not change Western Union's liability for refunds. As the Magistrate Judge observed, "[n]otwithstanding its title as a 'settlement fund,' the court finds that the $135 million deposited by Western Union in the CSF trust account does not reflect the actual economic benefit bestowed on the class by the Settlement." Add. 14. While the Magistrate Judge saw some value in "setting up a single unified fund to which class members can easily turn to recoup their unredeemed money transfers," Add. 17, it was not equivalent to the entire value of the fund. Class Counsel cannot claim credit for Class members' pre-existing right to principal merely by lumping it in with the relief actually secured by the settlement.

31

The Magistrate Judge found that the Class members had never been denied the right to their principal, whether before or after it escheated. Add. 15. As a consequence, the Magistrate Judge concluded: "[C]lass counsel's efforts in corralling unclaimed deposits for a specified time period into the CSF trust account did not bestow upon the class members an economic benefit that they did not already possess." Add. 15-16; *see also* Add. 16-17. Accordingly, she recognized that "basing a fee award on the funds in the CSF trust account substantially overestimates the benefit conferred upon the class by Class Counsels' efforts in creating the Class Settlement Fund." Add. 15. These findings of the Magistrate Judge were manifestly correct.

### C. Despite finding that the Class had an undisputed right to its principal, the District Court set out an erroneous benefit theory that had no evidentiary foundation

The District Judge did not disturb the Magistrate Judge's findings; in fact, he recognized that they were "technically correct." Add. 41. Thus, he should have determined that Class Counsel deserved no share of the principal that the Class had always owned. Nonetheless, the District Judge disregarded the logical import of these findings and, instead, pursued an erroneous and unfounded theory of benefit to the Class.

The District Court held that the settlement had secured a "practical" benefit for the Class, by making it easier for Class members to reclaim their principal. *Id.*

The District Court asserted that, under the company's refund procedure, customers faced a "detailed requirement for refund" and "anticipated delays in receiving payment." *Id.* In his view, "simply because the funds are locatable" does not mean "they can be retrieved without additional, probably preclusive, cost and effort." *Id.*

These assertions lack any evidentiary basis in the record. The District Court cited no facts in support of these conclusions. In fact, the record confirms that the refund procedure was no more onerous than the class settlement process.

For example, the District Court asserted that "the amounts owed to each member of the class are small, thus detracting from an incentive to comply with the detailed requirement for refund, and the anticipated delays in receiving payment." *Id.* This is incorrect on several levels. The District Court referred to no evidence that Western Union enforced "detailed requirement[s] for refund." *Id.* The contract between Western Union and the sender requires refund "within 45 days of receipt of a valid written request from the Sender." App. 90. The District Court made no findings suggesting that this simple procedure for requesting a refund was any more "detailed" than the settlement claims procedure will be.

Similarly, there is no evidence that the delay in receiving a refund was any longer under Western Union's refund procedures than it will be under the settlement. The contract provides for a refund in 45 days. The Settlement

33

Agreement contemplates a period for filing claims of 180 days, after which the

administrator is permitted several months to assess claims and distribute checks.

App. 116-19 [§§ 3.G.3-5, 3.G.8].

Finally, the incentives to participate in the settlement are comparable to

those for demanding a refund.  The chief advantage of settlement, as noted earlier,

is that it would include interest.  However, if Class Counsel are awarded a 30%

share from the Class Settlement Fund, the payments to Class members may need to

be reduced *pro rata* to accommodate the attorneys' fees.  The Magistrate Judge

found that basing Class Counsel's fee on the CSF's full value "would actually

leave class members in a *worse* position than before this litigation commenced."

Add. 16 (emphasis in original); *see also* Add. 18 ("[V]aluing this relief on a dollar-

to-dollar basis to the value of class members' unredeemed funds would

unreasonably inflate the economic benefit of this relief to the detriment of the

class.").  With the District Court's excessive fee award, Class members may only

break even, or perhaps lose money in this deal.  The incentives to pursue class

claims are not remarkably different.

The District Court's other assertions are similarly without support.  The

District Judge asserted that "[i]t cannot be demonstrated, as a practical matter, that

simply because the funds are locatable that they can be retrieved without

additional, probably preclusive, cost and effort."  Add. 41.  Once again, there is no

evidence that reclaiming principal using Western Union's refund procedure involved "preclusive" cost and effort.  In fact, the only cost revealed by the record is the contractual administrative fee applied to principal that went unclaimed for a year or more.  App. 90.  That same administrative fee will be assessed against customer refunds paid from the Class Settlement Fund.  App. 106 [§ 2.C.1] (deducting "administrative fees and charges" from class members' distributions).  There is no material difference in the "cost" of obtaining a refund under the company's procedures and the Settlement procedure.

Because the District Court's conclusion as to the "practical" benefit to the Class lacks evidentiary foundation, the attorneys' fee award must be reversed.  *Rosenbaum*, 64 F.3d at 1446; *Mann*, 46 F.3d at 1062.

### D.    The District Court did not find a measurable benefit from better notice

The District Court appeared to assume that, although Class members had an undisputed right to their principal, the "notice and assistance developed through collection efforts" would provide Class members with a better means of obtaining that principal.  Add. 41.  In the Court's words, notice and assistance "put[] the bird in the hand rather than in the bush."  *Id.*  The unstated premise of its decision is that the notice provided in the course of the claims process was itself the benefit of the settlement.

Significantly, the District Court did not take into account the fact that

Western Union *already* provided notice to Class members under its established

practice prior to this action.  It was undisputed that, prior to escheatment, Western

Union gave customers notice that their money transfers had not been redeemed and

were about to be transferred to the state.  In response to that notice, some 15% of

the recipients of such notices claimed their refunds.  App. 277-78 & n.7.

Thus, if the settlement's value hinged on notice to customers, the question

that the District Court should have asked was whether the notice contemplated by

the Settlement Agreement yielded any measurable benefit when compared to the

notice practices that already existed.  The District Court made no effort to identify

the extent of that alleged benefit.  *See Pearson*, 2014 WL 6466128, at *2

(reversing a fee award, in part, because of the district court's "contrary-to-fact

assumption" regarding a purported benefit's actual value).  It did not trace the

benefit "with some accuracy," as required by the Supreme Court in *Boeing*.  444

U.S. at 479.  Instead, the District Court credited the settlement claims process as

benefiting the Class to the full value of the CSF.  This was clearly error.

In the first place, it assigns a value to notice regardless of whether it results

in greater claims.  Notice has no value in and of itself, but only as a means to

increasing Class members' participation in the refunds.  In *Boeing*, the class

challenged the adequacy of notice as a means of establishing the defendant's

36

liability for the disputed principal.  *Id.* at 474.  Here, the liability for the principal was uncontested, so the additional notice contemplated by the class settlement (as a result of Rule 23 procedures) [1] would produce a benefit only if that notice was effective – that is, if it actually resulted in greater claims.  Class Counsel can justify their fee only by showing that the notice provided through this action is not merely adequate, then, but superior to the notice already given to Class members by Western Union.

That task is complicated by considerations of time limits.  The Settlement Agreement allows only 180 days to make claims, whereas state law typically makes funds that have escheated available to the claimant indefinitely.  The Magistrate Judge wrestled with this issue:  "[T]he ability to redeem escheated funds is, for the most part, infinite."  Add. 15.  Thus, the value of any enhanced notice must be counterweighed against the shorter period to make claims under the class settlement. [2]

---

[1] Notice was not the result of Class Counsel's efforts at all, but is provided in every class action settlement under Rule 23.  *See* Fed. R. Civ. P. 23(d)(1)(B), (e)(1).

[2] Further, the CSF cannot be valued on a dollar-to-dollar basis because the monies left unclaimed by Class members will be transferred to the states in a *cy pres* distribution.  Those *cy pres* funds will have no perceivable benefit to the Class – and indeed, in many cases, will result in Class members being worse off because funds transferred to the states would no longer be recoverable by Class members. *See Pearson*, 2014 WL 6466128, at *5; *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1077 (S.D. Tex. 2012)

The Magistrate Judge recognized that assigning a value to improved notice was, at this point, a wholly speculative endeavor. *See* Add. 24 n.9 ("[A]ny value to be assigned to this facet is too speculative and therefore the court declines to subjectively inflate the fund on this basis."). That conclusion is correct. Assigning a value to notice would involve a series of guesses: How many additional claimants would receive the notice (compared to those who received notice under Western Union's existing procedure)? What percentage of those who received the notice would make a claim? How will the 180-day claims period limit affect the claims rate?

In light of the amount of speculation required at this stage, a more accurate way to measure the effect of the class action notice is to count the actual claims made pursuant to the Settlement Agreement. While in the ordinary case it may not be necessary to await class administration for calculation of fees, it makes sense in this particular context, where the central economic benefit ascribed to the class settlement is not the resolution of disputed claims, but merely enhanced notification of the claimants' pre-existing rights to their own funds. Western Union suggested this solution in the District Court. App. 665. The claims period

---

("The class benefit conferred by cy pres payments is indirect and attenuated. That makes it inappropriate to value cy pres on a dollar-for-dollar basis."); *see also* Fed. R. Civ. P. 23 advisory committee notes ("Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class.").

is limited to 180 days – not an inordinate delay for determining Class Counsel's fees.

Even assuming that there was a benefit to the Class from the notice provided under the Settlement Agreement, there has never been a showing that this benefit was equal to the full amount of the Class Settlement Fund ($135 million). Ironically, Judge Kane himself rejected this equation.  In his July 8, 2014 Order, he stated that the "benefit [provided by the settlement] is categorically different from the unclaimed transfer funds themselves, and I agree with the magistrate judge that a fee request based on a percentage of those funds is excessive."  App. 712.  Yet that is precisely the measure he ultimately chose.

Attorneys' fees may be awarded from a common fund only if the lawsuit's benefits can "be traced with some accuracy."  *Boeing*, 444 U.S. at 478-79.  The District Court's conclusions about the lawsuit's benefits ignored the Plaintiffs' pre-existing refund rights and were unsupported by the record.  Therefore, the District Court's determination of the benefits to the Class should be reversed.[3]

---

[3] Western Union has standing to request this relief because of its reversionary interest in the *cy pres* funds generated by the settlement.  Those funds will be used to indemnify Western Union for liability and defense costs in the event that states do not accept the *cy pres* funds and sue Western Union instead. App. 502-03.  Several states have already stated their intent to follow that course.  App. 697-98.  A larger fee award will injure Western Union by reducing the funds available to protect Western Union from these impending state actions.  *See Boeing*, 444 U.S. at 481 n.7 (recognizing class action defendant's continuing interest in a fee dispute "arising from its colorable claim for the return of excess

II.    **THE PERCENTAGE OF THE FUND USED BY THE DISTRICT COURT IN CALCULATING THE FEE AWARD WAS UNREASONABLE GIVEN THE FUND'S SIZE**

A.    **Because of the Class Settlement Fund's large size, 30% is an unreasonable and excessive initial fee determination**

After determining the value of the common benefit, a district court must make "an initial determination of the appropriate percentage to award." *Copley*, 1 F. Supp. 2d at 1412. Here, the District Court began and ended its analysis with 30%, stating that this "is a lower percent than has been used in other cases and well within the range accepted by the Tenth Circuit Court of Appeals." Add. 42. This overlooks the reality that a 30% fee, though perhaps appropriately reflecting the skill and effort needed to secure a relatively small settlement, risks overvaluing class counsel's award as a settlement's size increases. The risk increases dramatically in the case of "megafunds" like the CSF, which weighs in at $135 million. That risk is compounded here because the ownership of the funds on which that percentage is based was undisputed. The District Court did not provide a rational basis for taking 30% of a huge $135 million fund and there is none. *See* App. 629-31.

---

money" from the common fund); *see also In re Hope 7 Monroe St. Ltd. P'ship*, 743 F.3d 867, 871-72 (D.C. Cir. 2014) (debtor may appeal bankruptcy court orders when success would result in a surplus to the estate). In this respect, Western Union is "a party from whom payment is sought," with standing to object. Fed. R. Civ. P. 23(h)(2).

In a leading analysis of the use of the percentage method, Judge Brimmer has concisely explained the rationale behind a smaller percentage for larger funds: "It is not one hundred fifty times more difficult to prepare, try, and settle a $150 million case than it is to try a $1 million case." *Copley*, 1 F. Supp. 2d at 1413; *see also Rosenbaum*, 64 F.3d at 1447 (observing that the putative common benefit "reach[ed] a significant total" only because of "the size of the corporation and the enormous number of class members"). Indeed, Class Counsel's own expert collected data showing that courts nationwide tend to grant smaller percentage fees for larger funds. *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 839 (2010).

Professor Fitzpatrick, whose conclusions the District Judge accepted, Add. 41-42, determined that in 2006 and 2007, settlements worth between $100 and $250 million produced mean and median percentage fees of 17.9 and 16.9 percent, respectively. Fitzpatrick, *supra*, at 839. In contrast, the average fee for settlements between $0 and $100 million ranged between 28.8% for the smallest settlements and 23.7% for the largest. *Id.* In fact, a fee of 30% or higher appears only *once* in Fitzpatrick's analysis, as the median fee for settlements between $750,000 and $1.75 million. *Id.* Thus, using 30% as a starting point for almost any size settlement, much less one as large as the CSF, appears to be an aberration.

Academic literature is uniform on this point.  Studies predating Fitzpatrick's findings reported a consistent inverse relationship between settlement size and the percentage fee awarded.  *Id.* at 814-16; *see also* Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 256 (1985) ("In most instances, [the fee award] will involve a sliding scale dependent upon the ultimate recovery, the expectation being that, absent unusual circumstances, the percentage will decrease as the size of the fund increases.").  Judge Brimmer has cited similar studies in making an initial percentage fee determination:

> Thus where fund recoveries range from $51–$75 million, fee awards usually fall in the 13–20% range.  In megafund cases like this one, wherein a class recovers $75–$200 million (or more), courts most stringently weigh the economies of scale inherent in class actions in fixing a percentage yielding a recovery of reasonable fees.  Accordingly, fees in the range of 6–10% and even lower are common in mega-common fund cases.

*Copley*, 1. F. Supp. 2d at 1413 (citing Herbert P. Newberg, *Attorney Fee Awards* § 2.09 (1986); William J. Lynk, *Courts and the Plaintiffs' Bar: Awarding the Attorney's Fee in Class-Action Litigation*, 23 J. Legal Stud. 185, 202 (1994) (showing that, from 1973 to 1990, recoveries of $75 million (the largest category in the study) generated fees ranging from 11.2% to 17.5%).  Other courts have observed similar figures.  *See, e.g.*, *Prudential*, 148 F.3d at 331 ("The district court examined the fee awards in other cases involving substantial recoveries, and found a range of 4.1% to 17.92% in cases where the recovery exceeded $100 million.").

42

Indeed, the authors of a study relied on by Fitzpatrick, App. 205-06, view

this scaling effect as a virtue of the class action mechanism:

> The existence of a scaling effect—the fee percent decreases as class
> recovery increases—is central to justifying aggregate litigation such
> as class actions.  Plaintiffs' ability to aggregate into classes that
> reduce the percentage of recovery devoted to fees should be a
> hallmark of a well-functioning class action system.

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class

Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 263 (2010)

(footnote omitted).

Thus, the District Court's statement that 30% is "well within the range

accepted by" the Tenth Circuit, without considering the size of the fund,

oversimplifies the analysis to the point of error.  The District Court did not look to

"comparable common fund cases," *Uselton*, 9 F.3d at 854, but simply considered

the entire range.  In fact, this Court's decisions since *Brown* embody a sliding

scale.  The *Brown* Court, for instance, affirmed an award of 16.5% from a $75

million fund.  838 F.2d at 453, 456.  Subsequently, this Court affirmed larger

percentages, but only for smaller settlement funds.  *See Gottlieb*, 43 F.3d at 484,

487-88 (22.5% of a $44 million fund); *Uselton*, 9 F.3d at 852 (29% of a $1.75

million fund).  The same pattern emerges from district court decisions in this

Circuit.  *See, e.g.*, *Lewis v. Wal-Mart Stores, Inc.*, No. 02-CV-0944, 2006 WL

3505851, at *2 (N.D. Okla. Dec. 4, 2006) (33% of $5.1 million); *Vaszlavik v.*

43

*Storage Corp.*, No. 95-B-2525, 2000 WL 1268824, at *5 (D. Colo. Mar. 9, 2000)

(30% of $5 million); *Copley*, 1 F. Supp. 2d at 1414 (13% of $150 million).

The sliding scale is crucial in supplying an objective framework for selecting

an appropriate percentage.  These examples of larger percentages for smaller funds

show that, if district courts do not look to a settlement's size in selecting the

percentage, they can simply cherry-pick percentages from other cases.  *See In re*

*Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1297 (9th Cir. 1994)

("With a fund this large, picking a percentage without reference to all the

circumstances of the case, including the size of the fund, would be like picking a

number out of the air.").  In contrast, using a sliding scale to set an initial fee

provides the Court of Appeals an "'adequate basis' . . . to review the

reasonableness of the percentage," *Brown*, 838 F.2d at 454, by anchoring a district

court's discretion in an empirical measure.  *See In re Cendant Corp. PRIDES*

*Litig.*, 243 F.3d 722, 736-41 (3d Cir. 2001) (reversing an excessive fee award

because "[t]he District Court did not undertake to review the fees granted in other

class action settlement cases, particularly in other large settlement cases, *i.e.*, cases

in which the common fund exceeded $100 million").  The comparison to other

cases of similar size helps establish a starting point for analysis of the remaining

*Johnson* factors.

The District Court made no effort to formulate the percentage in this case in light of this precedent.  The District Court simply considered whether the percentage requested by Class Counsel here was "within the range accepted by the Tenth Circuit Court of Appeals."  Add. 42.  The question should have been whether it was within the range accepted by this Circuit for cases of a comparable size.  The District Court did not present any analysis of its own regarding this issue.

The declarations of Professor Fitzpatrick cannot fill in this gap.  As noted above, his research confirmed the existence of a sliding scale, where the percentage chosen was in part dependent on the size of the fund.  Professor Fitzpatrick nevertheless offered three reasons why that framework should not apply to Class Counsel's fee motion.  First, he argued the benefit of injunctive relief was "*at least as substantial* as the cash relief."  App. 206.  As the District Court pointed out, however, it was the benefit to the plaintiff class, not the benefit to Western Union customers in general, that is relevant here, since the economic benefit to the class is the lynchpin of a common fund attorneys' fee award.  *See Pearson*, 2014 WL 6466128, at *7 (excluding value of injunctive relief to future purchasers, who were not members of class of injured purchasers).  Western Union's expert, Dr. Steven Shavell, presented evidence that the injunctive relief would be of minimal value to Class members because they were not likely to again

45

end up with unclaimed money transfers. App. 350-53, 482-84, 859-61. The

District Court agreed that it would be "folly" to "attempt[] to reduce to a dollar

amount the present value of the prospective relief obtained in the Settlement."

Add. 42.

Second, Professor Fitzpatrick argued that the sliding scale would cause class

counsel to seek smaller settlements: "[I]f courts award class counsel 30% of

settlements if they are under $100 million, but only 20% of settlements if they are

over $100 million, then rational class counsel will prefer to settle cases for $90

million (*i.e.*, a $27 million fee award) than $125 million (*i.e.*, a $25 million fee

award)." App. 207.

This is nonsense, as it only proves that a "step scale" is an inappropriate

means of making an initial fee determination. A sliding scale is obviously

different. For instance, Judge Brimmer noted that "where fund recoveries range

from $51–$75 million, fee awards usually fall in the 13–20% range." *Copley*, 1 F.

Supp. 2d at 1413. In a true sliding scale, recoveries closer to $51 million will tend

toward a 20% award, and recoveries approaching $75 million will tend toward

13%. This will make the break points with the next range imperceptible. There is

thus no merit to Fitzpatrick's suggestion that a sliding scale "blunt[s] the

incentives" of plaintiff's lawyers to pursue class actions. App. 207. As his own

research shows, the sliding scale is well established nationwide. That fact certainly

did not deter Class Counsel from pursuing this matter, nor has it deterred attorneys from pursuing countless other class actions.

Third, he argued that other courts have granted fee awards upwards of 30% in megafund cases. App. 208-09. However, none of the decisions he cited has undergone appellate review, where outrageous fees may be subjected to a dose of realism. Further, none of Fitzpatrick's cases occurred in the Tenth Circuit. There is no reported decision in this Circuit in which an attorneys' fee of 30% or greater was granted for securing a common fund of more than $100 million. In every post-*Brown* case from this Circuit in which a fee close to 30% was granted, the recovery was below $100 million. And perhaps most significantly, Class Counsel's award of $40.5 million is the largest single award in this Circuit for any common benefit recovery.

Even outside this Circuit, as Fitzpatrick conceded, courts grant superlative awards only "when the facts and circumstances justify it."[4] App. 208. In *Brown*, by contrast, this Court affirmed an award of 16% from a $75 million fund only after emphasizing the extraordinary nature of the case:

---

[4] The cases cited by Professor Fitzpatrick involve facts far different from this one. For example, in *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006), the district court awarded 31.33% of a $1.075 billion fund when class counsel had worked more than 100,000 hours over nine years, gone to trial twice, prevailed even when related cases had uniformly been decided against the plaintiffs, and already achieved an "unprecedented" claims rate of 92 percent.

> We view the award here in the context of approximately twenty-five years of litigation including several state and federal district court cases, at least six appeals to this circuit, massive discovery and evidentiary development, and several thousand docket entries. The total record of related cases in this matter is among the largest ever amassed in this circuit.

838 F.2d at 453 (emphasis added).

Nothing in the record here approaches the sort of extraordinary efforts needed to justify the mere 16% award in *Brown*. This was not a case with a lengthy trial. There was no merits discovery. The case settled so early that Western Union had not even answered the complaint. The only appeal initiated at the time of settlement (dealing with the motion to arbitrate) was never briefed. Class Counsel did not create a new fund. The value of the relief in this case resided largely in the interest. An award of 30% of the principal was plainly excessive. *See Prudential*, 148 F.3d at 339.

A sliding scale provides a fair, objective framework for evaluating a fee award based on a common fund. It cannot justify an award of 30% of the $135 million fund here.

### B.    The $40 million fee award does not survive a lodestar analysis

Consideration of Class Counsel's lodestar for this case – the value of hours reasonably incurred at market rates – confirms that the District Court abused its discretion when it made its $40 million award. While a lodestar calculation is not required in this Circuit, *Uselton*, 9 F.3d at 853, it may be used as a rough cross-

48

check for a percentage award. *See Copley*, 1 F. Supp. 2d at 1415 n.4; *accord Been v. O.K. Indus., Inc.*, No. CIV-02-285, 2011 WL 4478766, at *10-11 (E.D. Okla. Aug. 16, 2011); *Lucken Family Ltd. P'ship, LLLP v. Ultra Res., Inc.*, No. 09-cv-01543, 2010 WL 5387559, at *5 (D. Colo. Dec. 22, 2010).

The use of a lodestar benchmark has been especially recommended where, as here, the amount of the benefit conferred on the class is uncertain. *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995) ("[T]he lodestar rationale has appeal where[,] as here, the nature of the settlement evades the precise evaluation needed for the percentage of recovery method."); American Law Institute, *supra*, § 3.13(b) & cmt. b (endorsing use of a lodestar cross-check, "particularly when the value of the judgment or settlement is uncertain"); *see also* Manual for Complex Litigation (Fourth) § 14.121 (2004) ("Where actual common benefits are difficult to determine and possibly illusory, a benchmark (or any award based on a percentage of recovery) may likewise be inapplicable."). Here, where the value of the benefits is at best speculative, the lodestar cross-check shows that the award made is far out of proportion to the efforts of the attorneys. *See* App. 631-32 & n.10; App. 528-43.

In the proceedings before the Magistrate Judge, Class Counsel claimed that their lodestar was $9,451,308. Add. 29. This was the product of 13,006.8 hours and an average billable rate of $621 for partners, associates, and paralegals, plus

49

another $1,375,000 to cover future events.  *Id.*  Western Union pointed out that this lodestar calculation overestimated the value of counsel's effort for several reasons. For example, it assumed that six law firms had worked on the case without any duplication.  *Cf., e.g.*, *In re Boston Chicken, Inc. Sec. Litig.*, Nos. 97-cv-1308 et al., 2006 WL 2338188, at *2 (D. Colo. Aug. 10, 2006) (reducing lodestar hours by 10% because "some inefficiencies were inevitable" given involvement of multiple firms).  The calculation also assumed that the single largest contributor to the fee, in terms of both dollars and hours, was Mr. Paul Weiss, an attorney who never signed a pleading, appeared in court or took a deposition.  App. 520.  These and other questionable premises in compiling the lodestar led to a total lodestar number that was three times greater than the fees incurred by the defendants in the same case.  *See* App. 544 (defense firms incurred $3.1 million in fees and expenses through October 10, 2013).  Class Counsel's asserted lodestar, in short, was subject to question.[5]

But, even accepting at face value Class Counsel's assertions as to the lodestar, something is plainly amiss.  In light of Class Counsel's $40.5 million fee, their lodestar multiplier comes out to 4.3, and their average hourly fee for actual

---

[5] These questions remain unresolved.  The Magistrate Judge admitted that Class Counsel's number "does not constitute a true lodestar amount, as the court has not undertaken the extensive determination of whether Class Counsel's billing rates or individual billing entries are reasonable."  Add. 29.  The District Court did not address the support for the lodestar at all.

time spent as of the Magistrate Judge's fee decision amounts to over $3,100 for attorneys and non-attorneys alike. This Court has reversed fee awards with lower multipliers. *See Rosenbaum*, 64 F.3d at 1447-48 ("[O]ur conscience is shocked by an award of a 3.16 multiplier that results in a fee equal to more than $900 per hour for every attorney, paralegal, and law clerk who worked on the case."); *Miniscribe*, 309 F.3d at 1245 (bankruptcy trustee's request for a 3.5 multiplier was "excessive"); *see also Prudential*, 148 F.3d at 341 (vacating fee award, and noting that a 5.1 multiplier "only underscore[s] our questions about the [fee award's] propriety").

In the District Court, Western Union presented expert testimony that the multiplier needed to compensate for Class Counsel's risk of nonpayment is about 1.5. App. 356. This is because "the probability of settlement of class actions—the major situation in which class counsel are paid—is roughly two-thirds." App. 356. "The practical and real risk of nonpayment of class counsel is greatly reduced by the high frequency of settlement." App. 357. Class Counsel's own expert also found that the average multiplier awarded by courts in common fund cases is 1.65 and the median multiplier is 1.34. Fitzpatrick, *supra*, at 834.

Thus, a multiplier of 4.3 represents a huge windfall – the ability to take home over four times the originally invested time (assuming the lodestar is accurate). Here, where uncertainty surrounds the common benefits, the lodestar

51

cross-check should have been taken more seriously by the District Court. On this alternative theory, its award should be vacated and the case remanded so that the District Court can conduct a full-fledged lodestar inquiry.

### C.     The $40 million fee award does not survive a *Johnson*-factor analysis

In every fee award case in the Tenth Circuit, it is class counsel's burden to establish that their fee is reasonable in light of the *Johnson* factors. *See Brown*, 838 F.2d at 454; App. 309-16. In *Brown*, this Court "reaffirmed the relevance of the twelve factors originally developed for statutory fee determinations in *Johnson*." *Uselton*, 9 F.3d at 853. "Because these factors measure the attorneys' contributions, they are also appropriate in setting and reviewing percentage fee awards in common fund cases." *Brown*, 838 F.2d at 454. While "their applicability and weight in common fund situations would undoubtedly be different," *Uselton*, 9 F.3d at 853, the district court must "'articulate specific reasons for fee awards to give [this Court] an adequate basis' . . . to review the reasonableness of the percentage and thus the reasonableness of the award." *Brown*, 838 F.2d at 454 (citation omitted).

In this case, the District Court did not independently assess the *Johnson* factors – or at least failed to articulate its findings with regard to the applicability, weight and record evidence supporting the *Johnson* factors. Instead, the District Court said it was "persuaded" by the analysis of Class Counsel's expert

52

(Fitzpatrick).  Add. 41-42.  This is confusing, in that the District Court also rejected parts of the Fitzpatrick analysis, such as his valuation of the injunctive relief.  *Id.*  But, assuming that the District Court intended to substitute the expert's analysis for its own, the conclusion cannot stand, for on each of the key objective factors, Fitzpatrick's declaration makes the very same errors already identified in this brief.  Moreover, the remaining factors do not carry enough weight, on this record, to sustain the result.

> In *Brown*, this Court explained:
>
> The *Johnson* factors are: (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee—this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Brown*, 838 F.2d at 454-55.

It is clear that the first factor – the time and labor involved – cannot justify the huge award in this case.  Professor Fitzpatrick makes a valiant effort to argue that the case took three years, sparked several motions, and entailed discovery not related to the merits.  App. 212.  However, Class Counsel's efforts did not come close to those of the attorneys in *Brown*, who litigated for 25 years but received a

much lower percentage.  838 F.2d at 453.  The 4.3 multiplier in this case is well above figures rejected by this Court.  The judgment cannot be justified based on time and labor.

Nor can a $40 million award be justified based on the eighth factor – the results obtained.  Professor Fitzpatrick figures that there were three components of monetary relief:  unescheated principal, interest, and the administrative fees charged by Western Union, with a combined value of $230 million.  App. 209.  As noted above, however, Class Counsel obtained only one of these – the interest.  Class Counsel did not secure the principal, which already belonged to the Class members, and the settlement did not provide for recovery of administrative fees.  Thus, Professor Fitzpatrick assumed a much higher monetary recovery when the value of the monetary relief was no more than $19 million in interest.

Professor Fitzpatrick also assumed value in the injunctive relief, when the District Court itself found it was too speculative to be reduced to a dollar amount.  Add. 42 ("I am also convinced . . . of the folly in attempting to reduce to a dollar amount the present value of the prospective relief").  As for other forms of relief, Fitzpatrick admits that their value is speculative.  For example, in discussing Class Counsel's assistance in recovering escheated funds, he wrote, "[Assistance by Class Counsel] *could be worth as much as* $83 million dollars [sic] *depending on how many* Class Members seek escheatment recovery."  App. 211 (emphasis

54

added).  Thus, the value of Class Counsel's assistance cannot be "traced with some accuracy" until it is known how many Class members receive the Settlement notice and come forward with their claims.  *Boeing*, 444 U.S. at 479.  Fitzpatrick's valuation of the settlement, then, is a house of cards, each resting upon an assumption debunked elsewhere in the record.

Finally, the Court's award cannot be justified based on the "customary fee" or "awards in similar cases."  Professor Fitzpatrick's own research confirms the existence of a sliding scale, contemplating lower percentage awards for higher recoveries.  It is this practice that is "customary," and it is the case law addressing recoveries in excess of $100 million that is "similar."  By his own admission, a 30% slice of $135 million is out of line.

If the $40 million award cannot be justified by the labor involved, the results obtained, or the practice in similar cases, it will not be justified by the other, less significant, *Johnson* factors.  Some factors, such as the novelty and difficulty of the questions or the skill and experience of the lawyers, are subsumed in the hours or rates used in the lodestar calculation.  Manual for Complex Litigation, *supra*, § 14.122 n.524.  Others have no role in this case at all.  Fitzpatrick does not purport to show the undesirability of the case, preclusion of employment in other matters, or time limitations imposed by the client.

The District Court did not make the kinds of findings required under the *Johnson* framework. Based on any reasonable application of the *Johnson* factors, the award in this case is excessive.

## **CONCLUSION**

For the foregoing reasons, Western Union asks this Court to reverse the District Court's attorneys' fee award and remand for consideration of an award based only on the $19 million common benefit procured by Class Counsel. In the alternative, Western Union asks this Court to vacate the award as excessive and remand for reconsideration in light of similarly sized settlements and for application of an appropriate lodestar cross-check.

Dated:  December 15, 2014        Respectfully submitted,

                                                 s/ Charles G. Cole

Jason A. Yurasek                     Charles G. Cole
PERKINS COIE LLP             Thomas M. Barba
4 Embarcadero Center, Suite 2400    STEPTOE & JOHNSON LLP
San Francisco, CA 94111             1330 Connecticut Avenue, NW
Telephone:  (415) 344-7000       Washington, DC  20036-1795
jyurasek@perkinscoie.com           Telephone:  (202) 429-3000
                                        ccole@steptoe.com
Jess A. Dance                        tbarba@steptoe.com
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone:  (303) 291-2300
jdance@perkinscoie.com

*Counsel for Appellants The Western Union Company*
*and Western Union Financial Services, Inc.*

57

## <u>STATEMENT ON ORAL ARGUMENT</u>

Because of the importance and complexity of the issues involved, Appellants respectfully submit that oral argument is appropriate.

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief contains 13,341 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), and therefore complies with Rule 37(a)(7)(B)'s type-volume limitation.

This brief has been prepared in a monospaced typeface in 14-point Times New Roman font, and therefore complies with Rule 32(a)(5) and (a)(6).

Dated:  December 15, 2014          s/ Charles G. Cole _____
                                   Charles G. Cole

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that the foregoing, as submitted in digital form via the

Court's ECF system, is an exact copy of the written document filed with the Clerk

and has been scanned for viruses with Symantec Endpoint Protection software and,

according to the program, is free of viruses.  In addition, I certify that all required

privacy redactions have been made.


Dated:  December 15, 2014                    <u>s/ Charles G. Cole          </u>
                                             Charles G. Cole

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of December, 2014, I presented the

foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system,

which will send notification of such filing to all counsel of record.

In addition, I certify that on the 15th day of December, 2014, I served copies

of the same by first class mail to each of the following counsel of record:

Richard J. Burke
Quantum Legal LLC
1010 Market Street, Suite 1310
St. Louis, MO  63101


Dated:  December 15, 2014                    s/ Charles G. Cole
                                             Charles G. Cole

**ADDENDUM PURSUANT TO 10TH CIR. R. 28.2(A)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-00938-MSK-KMT

JAMES P. TENNILLE,
ROBERT SMET,
ADELAIDA DELEON, and
YAMILET RODRIGUEZ, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE WESTERN UNION COMPANY, a Delaware Corporation, and
WESTERN UNION FINANCIAL SERVICES, INC.,

      Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

_____

**Magistrate Judge Kathleen M. Tafoya**

      This case comes before the court on "Plaintiffs' Motion of Class Counsel for Approval of Attorneys' Fees, Costs, and Expenses and for Approval of Incentive Awards" (Doc. No. 195, filed Apr. 30, 2013 [Mot. Attys.' Fees]) and Memorandum of Law in Support (Doc. No. 196 [Memo]), as well as "Defendants' Motion to Strike and Request for Attorneys' Fees" (Doc. No. 208, filed May 15, 2013 ["Mot. Strike"]).  For the following reasons, the court recommends that Defendants' Motion to Strike be DENIED and that Plaintiff's Motion for Attorneys' Fees be GRANTED IN PART.

# BACKGROUND

### A.      *Case Background*

Plaintiffs, on behalf of a nationwide class of wire transfer customers, have asserted claims for conversion, unjust enrichment, breach of fiduciary duty, and declaratory relief[1] against Western Union Company and Western Union Financial Services Inc. (hereinafter, collectively, "Western Union").  The allegations of Plaintiffs' Second Amended Consolidated Class Action Complaint (Doc. No. 45, filed Mar. 11, 2011 [hereinafter "Second Am. Compl." or "SAC"]) center on Western Union's practice of failing to timely notify customers when their attempted wire transfers failed or went unclaimed.  In lieu of notifying their customers that the money they deposited for transfer never reached its intended recipient, Western Union held those funds in interest-bearing accounts, sometimes for years, until individual state unclaimed property statutes triggered a notification obligation.  Only at that time did Western Union attempt to return their customers' unclaimed deposits (but less accrued fees for their 'accommodation' in holding the funds), while keeping all the interest, accrued for many years, for itself.  Plaintiffs contended the failure to timely notify customers that their money transfers were unsuccessful and then thereafter retaining interest properly belonging to their customers was wrongful and subjected Western Union to equitable or quasi-equitable claims for conversion and unjust enrichment.

On June 7, 2011, Defendant Western Union Financial Services, Inc. filed a Motion to Compel Arbitration.  (Doc. No. 56.)  All discovery, with the exception of discovery relating to

---

[1] Despite acknowledging that Senior District Judge John L. Kane previously dismissed this claim for failure to state a claim for relief (*see* Courtroom Minutes, Doc. No. 37), Plaintiffs' Second Amended Complaint also included a claim for consumer fraud under the Colorado Consumer Protection Act.  (SAC at 16-18.)

the arbitration issue, was stayed pending resolution of the Motion to Compel Arbitration.  (*See* Courtroom Minutes, Doc. No. 74, filed July 1, 2011).  On November 21, 2011, after hearing oral argument, Senior District Judge John L. Kane denied the Motion to Compel Arbitration. (Courtroom Minutes, Doc. No. 139.)  Two days later, Western Union appealed Judge Kane's order to the Tenth Circuit.  (Doc. No. 141, filed Nov. 23, 2011.)

While the appeal was pending, the parties engaged in settlement discussions—including mediation before David W. Aemmer, Chief Circuit Mediator for the United States Court of Appeals for the Tenth Circuit—and, on November 16, 2012, executed a final, comprehensive Stipulation and Agreement of Compromise and Settlement.  (Doc. No. 172-2 ["Settlement Agreement"].)  Judge Kane preliminarily approved the settlement on January 3, 2013.  (*See* Doc. No. 175, "Preliminary Approval Order".)  After conducting a Fairness/Final Approval Hearing on June 24, 2013, Judge Kane issued final approval of the Settlement Agreement, dismissed all claims filed in the litigation with prejudice, and entered final judgment.  (*See* Minute Entry, Doc. No. 254; Am. Final J., Doc. No. 256.)

### B.      *The Settlement Agreement*

The Settlement Agreement provides four separate types of relief for class members. First, it requires that Western Union place in a trust account (hereinafter the "CSF trust account" or "Class Settlement Fund") the class members' unclaimed money transfer funds that were initiated on or after January 1, 2001 and still being held by Western Union on the date of Final Approval, less the administrative fees and charges specified in class members' contracts and/or permitted by state statutes.  (Settlement Agmt. ¶ 2.A.3.)  Class members whose funds have not

yet escheated to the state (and have not otherwise been redeemed) are entitled to receive lump

sum cash refunds from the CSF trust account in an amount equal to their unclaimed funds, less

administrative fees and charges specified in the contracts or permitted by state law.  (*Id.* § 2.C.1.)

At the time of the Final Approval, the estimated amount of unescheated deposits belonging to

customers to be deposited into the CSF trust account is $135 million.  (*See* Am. Final J. ¶ 13.)

Second, class members whose unclaimed funds have already escheated to the state as of

the date of the Final Approval are entitled to – and in fact have always been entitled to – recover

those funds from the jurisdiction to which the funds originally escheated.  These class members

will receive notice that they may be entitled to recover money from the appropriate state,

territory, district, or United States jurisdiction and will be mailed an Escheat Recovery Form and

Instructions.  (Settlement Agmt § 2.B.1.)

Third, upon submission of a valid claim form, all class members—regardless of whether

their unclaimed money transfer funds have been held by Western Union in its accounts,

redeemed at some point by the depositor, or escheated—are entitled to receive a lump sum equal

to the amount of interest that accrued on those funds while they were held by Western Union.

(*Id.* ¶¶ 2.B.2, 2.C.2, 2.C.5.)  The parties have estimated that the amount of accrued interest on the

unclaimed funds is equal to approximately $19 million dollars.

Fourth, the Settlement Agreement also provides for forward-looking or prospective

injunctive relief.  Specifically, when not contrary to a request from any law enforcement agency

or prohibited by law, court order, or other legal process, Western Union has agreed to modify its

policies and practices so that it will notify customers who sent money transfers within 60-90

days[2] that their money transfers were not redeemed, rather than delaying notification until years later at the time of likely escheatment.  (*Id.* ¶ 2.D.1.)

Also, in recognition of their efforts on behalf of the class, the Settlement Agreement provides that each Class Representative, i.e. named Plaintiff, shall receive a $7,500 incentive award.  (*Id.* § 4.)  Subject to the court's approval, these incentive awards will be paid from the CSF trust account.  (*Id.* § 4.A.)

If any funds remain in the CSF trust account after full payment of all valid claims, administration fees, class representative incentive awards and attorneys' fees and expenses, those monies, along with accumulated interest, will be placed into a *cy pres* fund subject to distribution upon court order.  The parties recommend to the court that the *cy pres* fund be paid to the states, territories, districts, and U.S. jurisdictions in the same proportion that would have escheated to the jurisdictions had the case not been brought and settlement not been achieved. [3]  (*Id.* § 6.A.)

## C.      *Attorneys' Fee Procedural History*

Plaintiffs' Motion for Attorneys' Fees was filed on April 30, 2013—after the Settlement agreement was preliminarily approved, but before it was finally approved and judgment was entered.  (*See* Mot. Attys.' Fees.)  Defendants' Objection to Class Counsel's Motion for

---

[2] Customers will receive notice within 60 days for money transfers other than Quick Collect money transfers paid to receivers via checks.  (Settlement Agmt. § 2.D.1.) Customers using Quick Collect money transfers will be notified within 90 days that their money transfers have not been redeemed.  (*Id.*)

[3] These funds are specifically not escheated to the various jurisdictions, however, because the class members' rights to those funds in the *cy pres* account are forever extinguished by virtue of the class action settlement.

Attorneys' Fees was filed on May 15, 2013 (Doc. No. 207 [Resp. Mot. Attorneys' Fees]) and

Plaintiffs filed their Reply on June 3, 2013 (Doc. No. 227 [Reply Mot. Attorneys' Fees]).

Defendants' Motion to Strike was filed on May 15, 2013, contemporaneously with their

Response to the Motion for Attorneys' Fees.  Plaintiffs filed their Response to the Motion to

Strike on June 3, 2013 (Doc. No. 226 [Resp. Mot. Strike] and Defendants' filed their Reply on

June 19, 2013 (Doc. No. 244 [Reply Mot. Strike]).  Judge Kane referred these motions to this

court on June 24, 2013.  (Minute Order, Doc. No. 252.)

On September 27, 2013, the court held a day-long Settlement Conference regarding

Plaintiffs' Motion for Attorneys' Fees and Defendants' Motion to Strike.  (*See* Doc. No. 285.)

Although the Settlement Conference provided an opportunity for the court to informally discuss

the pending motions with the parties, no settlement was reached.

On September 30, 2013, this court directed Plaintiffs to file a Notice of Lodestar

Calculation that included, in addition to their hourly billing associated with the case: (1) each

attorneys' billing rate; (2) justification for the billing rate; and (3) an estimate of the future hours

that will be necessary to carry the case to completion under the Settlement Agreement.  (Order,

Doc. No. 286.)  The court also required that Plaintiffs produce for *in camera* review the detailed

billing records supporting the calculations set forth in the Notice of Lodestar Calculation.  (*Id.*)

Plaintiffs filed their Notice of Lodestar Calculation on October 7, 2013, (Doc. No. 290 [Not.

Lodestar Calc.]) and submitted their detailed billing records on electronic media for *in camera*

review.  Western Union filed its Response to the Notice of Lodestar Calculation on October 17,

2013 (Doc. No. 298) and Plaintiffs filed a Reply[4] on October, 23, 2013 (Doc. No. 301).

Accordingly, the motions are ripe for the court's review and recommendation.

## LEGAL STANDARD

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed R. Civ. P. 23(h).  Such a claim "must be made by motion under Rule 54(d)(2)" and notice of the motion must be "directed to class members in a reasonable manner," who may then "object to the motion."  Fed. R. Civ. P. 23(h)(1)-(2).  The court must also "find the facts and state its legal conclusions under Rule 52(a)."[5]  Fed. R. Civ. P. 23(h)(3).

In turn, Federal Rule of Civil Procedure 54(d)(2) requires a claim for fees to be made by motion, and specifies its timing and content, including, in relevant part, "the grounds entitling the movant to the award" and "the amount sought."  Fed. R. Civ. P. 54(d)(2)(B).  Notice of Class Counsels' Motion for Attorneys' Fees was provided in the Long Form Notice attached to the Preliminary Approval Order.  (*See* Doc. No. 175-1 at 7.)

"In class actions, the district court has broad authority over awards of attorneys' fees."  *Law v. Nat'l Collegiate Athletic Ass'n,* 4 F. App'x 749, 751 (10th Cir. 2001) (citation omitted).  Often, when a fund is created for the benefit of the class, either through settlement or a judgment

---

[4] This filing is actually entitled "Class Counsels' Response to Defendants' Response to Class Counsel's Notice of Lodestar Calculations"; however, the court construes, and hereinafter refers to, this filing as Plaintiffs' Reply in Support of its Notice of Lodestar Calculation.

[5] Rule 23(h)(4)  provides that the court may refer issues related to the amount of the award to a magistrate judge as provided in Rule 54(d)(2)(D).  Rule 54(d)(2)(D), in turn, provides that a motion for attorney's fees may be referred to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter.  Fed. R. Civ. P. 54(d)(2)(d).  Accordingly, the court must issue a recommendation on Plaintiffs' Motion for Attorneys' Fees.

on the merits, the common fund doctrine is used as a method for proportionately spreading payment of attorneys' fees among the class members.  *Gottlieb v. Barry,* 43 F.3d 474, 482 (10th Cir. 1994); *see also In re Miniscribe Corp.,* 309 F.3d 1234, 1242 (10th Cir. 2002) (common fund doctrine applies when (1) the class of persons benefitted by the lawsuit is small and easily identifiable, (2) the benefits can be traced with some accuracy, and (3) the costs of the litigation can be shifted accurately to those who profited by it).

The common fund doctrine is an equitable exception "to the general principle that requires every litigant to bear his own attorney's fees."  *Boeing Co. v. Van Gemert,* 444 U.S. 742, 478 (1980).  Attorneys' fees are appropriately awarded under the common fund doctrine based on the theory "that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigants' expense."  *Id.*; *see also In re Miniscribe,* 309 F.3d at 1242 (common fund is an equitable doctrine justified to prevent non-litigants from obtaining "a free ride on the trailblazer's efforts").

The Tenth Circuit has approved two ways for determining a reasonable attorneys' fees in common fund cases—the "percentage of the fund" method and the "lodestar plus multiplier" method.  *Gottlieb,* 43 F.3d at 482-83.  Under the "percentage of the fund" method, an appropriate fee award is based on a percentage of the total economic benefit bestowed on the class.  *See, e.g., Anderson v. Merit Energy Co.,* No. 07-cv-00916-LTB-BNB, 2008 WL 3378526 at *3 (D. Colo. Oct. 20, 2009) (citing *Brown v. Phillip Petroleum Co.,* 838 F.2d 451, 454 (10th Cir. 1988)); *Lucken Family Ltd. P'ship*, 2010 WL 5387559, *6 (Dec. 22, 2010).  Alternatively, under the lodestar method, class counsel's reasonable hours are first multiplied by a reasonable hourly rate.

8

*See, e.g., Robinson v. City of Edmund,* 160 F.3d 1275, 1281 (10th Cir. 1998).  A multiplier is then added to this lodestar amount to account for risk.  *See, e.g., Lucas v. Kmart,* 99-cv-01923-JLK-CBS, 2006 WL 2729260, at *3 (D. Colo. 2006).

"[E]ither method is permissible," although the Tenth Circuit has evinced "a preference for the percentage of the fund method."  *Gottlieb,* 43 F.3d at 483 (citing *Uselton v. Commercial Lovelace Motor Freight, Inc.,* 9 F.3d 849, 853-54 (10th Cir. 1993)).  The Tenth Circuit favors the percentage of the fund approach because it "is less subjective than the lodestar plus multiplier approach," matches the marketplace most closely, and is the better suited approach when class counsel were retained on a contingent fee basis, as in this case.  *Lucken Family Ltd. P'ship v. Ultra Resources, Inc.,* No. 09-cv-01543, 2010 WL 5387559, at *2 (Dec. 22, 2010) (citing *Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir. 1998)).

Regardless of the method employed, the court must also consider the twelve factors originally developed in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974), to determine whether the fee request is reasonable.  Overall, the guiding principle for determining an appropriate award of attorneys' fees is that the fee must be reasonable under the circumstances.  *Gottlieb,* 43 F.3d 474 at 482.

## ANALYSIS

### I.   *MOTION TO STRIKE*

Before turning to Class Counsels' Motion for Attorneys' Fees, the court considers Western Union's Motion to Strike.  Western Union requests that the court strike the Affidavit of

R. Larry Johnson (Doc. No. 200 [Johnson Aff.])[6] submitted in support of Plaintiffs' Motion for Attorneys' Fees. Western Union argues that Mr. Johnson's affidavit should be stricken because it relies on two spreadsheets that are subject to a Confidentiality Agreement executed between the parties in September 2010 as part of their initial settlement discussions.

In pertinent part, the Confidentiality Agreement states that all "written materials exchanged during the course of settlement discussions are privileged . . . are nondiscoverable and inadmissible for any purpose in any legal proceeding, may not be used for any other purpose, and may not be shared with any third parties," as well as that "[n]o aspect of the settlement discussions shall be relied upon or introduced as evidence in any arbitral, judicial, or other proceeding." (Declaration of Jason Yurasek, Doc. No. 207-1, Ex. 1 ["Confidentiality Agmt."].) Western Union maintains that Plaintiffs violated the Confidentiality Agreement by disclosing the spreadsheets, which were exchanged as part of the initial settlement discussions, to Mr. Johnson and then by filing information derived from those spreadsheets as part of Mr. Johnson's affidavit. Western Union also argues that they should be awarded attorneys' fees incurred in bringing the Motion to Strike because the Confidentiality Agreement states "[a]ny party breaching this agreement shall be liable for and shall indemnify the nonbreaching parties for all costs, expenses,

---

[6] Western Union's Motion to Strike also seeks to strike the Declaration of Brian T. Fitzpatrick because it was not declared under penalty of perjury pursuant to 28 U.S.C. § 1746(2). However, Defendants have abandoned this argument in their Reply, likely because Plaintiffs attached to their Reply to the Motion for Attorneys' Fees a Supplemental Declaration from Professor Fitzpatrick that incorporates the paragraphs of the original declaration and is properly verified. Because the verification in Professor Fitzpatrick's supplemental declaration cures the deficiencies, if any, of his original declaration, the court does not address this argument.

liabilities, and fees, including attorneys' fees, which may be incurred as a result of such breach."[7]  (*Id.*)

The court declines to strike Mr. Johnson's affidavit.  First, Western Union's primary legal support for striking Mr. Johnson's affidavit is that a "'court may strike an affidavit or brief as a sanction for noncompliance with court order or other misconduct.'"  (Reply Mot. Strike at 8) (quoting *Lewis v. Michaels Stores, Inc.,* No. 05-cv-1323, 2007 WL 2254502, at *13 (M.D. Fla. Aug. 3, 2013)).  The Confidentiality Agreement plainly is not a court order.  Nor is it clear that Plaintiffs' actions constitute "other misconduct."

Second, the court finds that Western Union waived the provisions of the Confidentiality Agreement that prohibit the use of materials exchanged during the course of the settlement discussions in any legal proceeding.  It is undisputed that both of the spreadsheets at issue were introduced as exhibits at the Fed. R. Civ. P. 30(b)(6) deposition of Chris Guinas without any objection from Western Union.  Although Western Union argues that using the spreadsheets at this deposition was permissible because Mr. Gunias is a Western Union corporate representative, the Confidentiality Agreement's prohibition on using settlement materials in judicial proceedings does not hinge on whether those proceedings involved the parties or their representatives or third parties—it prohibits their use *altogether* in judicial proceedings.

---

[7] Western Union also argues in the Motion to Strike that Mr. Johnson's opinions are not reliable under Fed. R .Evid. 702.  The court declines to consider this argument because, as outlined infra, Western Union lacks standing to challenge Plaintiff's fee petition.  *See also NetQuote, Inc. v. Byrd,* No. 07-cv-00630-DME-MEH, 2008 WL 4572528, at *2 (D. Colo. Oct. 14, 2008) (Rule 702 governs the admissibility of expert testimony *at trial).*

Third, to the extent that Defendants argue that Plaintiffs violated the Confidentiality agreement by disclosing purportedly confidential information to a third party, Mr. Johnson, it is unclear how striking Mr. Johnson's affidavit would remedy that purported breach. More specifically, although Plaintiffs originally filed Mr. Johnson's affidavit under seal, Judge Kane subsequently unrestricted the affidavit because Plaintiffs had not identified "any interest that needs to be protected in keeping the matters set forth in the subject Declaration from the public." (Minute Order, Doc. No. 203.) Western Union did not contest or challenge that ruling. Accordingly, the purportedly confidential information disclosed in Mr. Johnson's affidavit is now publically available and striking Mr. Johnson's affidavit would not alter that fact.

This court finds that the Motion to Strike, including Defendants' request for attorneys' fees therewith, is properly denied and therefore recommends the District Court decline to exercise its discretion to strike the Johnson Affidavit.

## II.   *MOTION FOR ATTORNEYS' FEES*

### A.   *Right to Object under Fed. R. Civ. P. 23(h)(2)*

A threshold dispute raised in the briefing on the Motion for Attorneys' Fees is whether Western Union has a right to object to Class Counsels' fee request. Plaintiffs argue that Western Union does not have any "standing" to object to Class Counsels' fee request because both the Preliminary Approval Order and Federal Rule of Civil Procedure 23(h)(3) foreclose it. The court agrees.

Rule 23(h) provides "[a] class member, or a party from whom payment is sought, may object to the motion [for attorneys' fees]." Fed. R. Civ. P. 23(h)(2). Because Western Union's

payment of unredeemed and unescheated customer funds – funds as to which Western Union admits it has no ownership right – into the CSF trust account is not in any way contingent on the amount of attorney's fees awarded, they are not a party from whom payment is sought.  *See also Been v. O.K. Industries, Inc.,* No. CIV-02-285-RAW, 2011 WL 4478766, at \*15 (E.D. Okla. Aug. 16, 2011).  Judge Kane's Preliminary Approval Order further confirms Western Union has no basis to object to Class Counsels' fee petition, holding, "[o]nly Class members and their representatives may object to the fairness, reasonableness, or adequacy of the proposed settlement, *including the proposed award of attorneys' fees and expenses.*"  (Prelim Approv. Order ¶ 11) (emphasis added.)

Western Union nevertheless argues that whether it has a right to object to Class Counsels' fee request is irrelevant because the court has an independent fiduciary duty to the class to ensure that the fee award to Class Counsel is reasonable.  (Resp. Mot. Attys.' Fees at 9, n.3 (citing *Zucker v. Occidental Petroleum Corp.,* 192 F.3d 1323, 1328-29 (9th Cir. 1999)).  However, following Western Union's argument to its logical conclusion would mean that literally anyone, regardless of whether they have a connection to the class or case, could submit objections to a proposed attorneys' fee award, in hopes that he or she might "assist" the court in reaching reasonable fee.  This result would not only be impractical, but would also render Rule 23(h)(2) toothless.

The court does, of course, have an independent duty to review and approve Class Counsel's proposed fee award.  As such, although it does not directly address Western Union's

objections, it does raise and consider arguments similar to those raised in Defendants' Response to the Motion for Attorneys' Fees.

### B.   Attorneys' Fee Award

Class Counsel seek an attorneys' fee award of 30 percent of the CSF trust account holdings, i.e. the "Class Settlement Fund," characterizing this as the relevant "common fund." Approximately $135 million of customers' unclaimed but deposited funds held by Western Union are to be placed into the CSF trust account. Therefore, Plaintiffs' proposed fee award would equal approximately $40.5 million. Plaintiffs argue that the total value of the Settlement is not just this $135 million in the CSF trust account, but rather that the real value to class members of the Settlement is over $400 million. Thus, they argue, an award of $40.5 million constitutes just over 10% of that total value of the Settlement—a percentage well below the 30% threshold commonly approved for attorneys' fees in this District. *See, e.g., Merit,* 2009 WL 3378526 at *3 ("The customary fee to class counsel in a common fund settlement is approximately one-third of the economic benefit bestowed on the class"). This court considers Plaintiffs' argument, however, to be fatally flawed.

### 1.   Components of the "Common Fund"

The court elects, in accordance with Tenth Circuit precedent, to follow the percentage of the fund method for calculating reasonable attorneys' fees, but finds that Class Counsels' proposed fee award as calculated is unreasonable. Notwithstanding its title as a "settlement fund," the court finds that the $135 million deposited by Western Union in the CSF trust account does not reflect the actual economic benefit bestowed on the class by the Settlement. Instead, for

14

reasons described below, the court finds that the economic benefit to the class, and therefore the "common fund" in this case, consists of the $19 million in interest that Western Union has agreed to compensate class members together with the ascertainable monetary value of the injunctive relief.

### a.   Class Settlement Fund/CSF Trust Account

The court finds that basing a fee award on the funds in the CSF trust account substantially overestimates the benefit conferred upon the class by Class Counsels' efforts in creating the Class Settlement Fund.  Although it is undisputed − as alleged by Plaintiffs in their Second Amended Complaint − that Western Union purposefully and intentionally failed to notify customers when their intended and paid for money transfers went uncompleted, resulting in the unclaimed deposits remaining in the custody of Western Union for years, Plaintiffs have *never* alleged that Western Union wrongfully withheld unredeemed money transfers when customers requested they be refunded.  In fact, it is undisputed that Western Union held these unclaimed funds until either, (1) they were redeemed by the original depositor (class member), or (2) in the face of no claim for redemption, Western Union escheated the unclaimed funds to specific jurisdictions based upon the situs of the original transaction.  Thus, regardless of the outcome of this litigation, class members always had a right to a refund of the dollar value of their uncompleted money transfers (less contractually agreed-upon administrative fees) from either Western Union or their escheatment authority.

Further, the ability to redeem escheated funds is, for the most part, infinite.  As a consequence, class counsel's efforts in corralling unclaimed deposits for a specified time period

into the CSF trust account did not bestow upon the class members an economic benefit that they did not already possess. *See Droegemueller v. Petroleum Dev. Corp.,* 07-cv-1362-JLK-CBS, 2009 WL 961539, at *2 (D. Colo. Apr. 7, 2009) (citing *Brown,* 838 F.2d at 454) (determining an attorneys' fee award based on the percentage of the fund is warranted where the common fund has been created *as a result of class counsel's efforts*); *Savoie v. Merchants Bank,* 84 F.3d 52, 56-57 (2d Cir. 1996) (actions of the party seeking to recover attorneys' fees "must be a substantial cause of the benefit obtained").

Basing any award to Class Counsel on the funds in the CSF trust account alone -- i.e., one-third of the $135 million in unclaimed money transfers—would actually leave class members in a *worse* position than before this litigation commenced. As such, the court finds that a fee constituting 30% of the $135 million contained in the CSF trust account would be unreasonable. Therefore, the court declines to find that the Class Settlement Fund constitutes the "common fund" in this action.

### b.    *Escheated Funds*

For reasons similar to those discussed with respect to the Class Settlement Fund, the court finds that Class Counsel has overvalued the economic benefit of their agreement to assist class members in recouping their funds that have escheated to the state or other jurisdictions. Class Counsel has estimated that this aspect of the Settlement is worth approximately $83 million, which constitutes the approximate total dollar value of class members' unredeemed funds that have escheated during the relevant time period. However, it is beyond cavil that, under relevant state law, these class members had and have a preexisting right to recoup their

16

escheated funds.[8]  Thus, Class Counsel's efforts in this litigation did not somehow create the $83 million value of the escheated funds for the benefit of class members.  Further, the gathering of unclaimed deposits belonging to customers into this settlement, especially in the case of soon to be escheated deposits, actually works to the detriment of the class members by extinguishing their perpetual right to petition escheating jurisdictions for return of the deposits at any point in time should they discover, by publication or other broadcasting, that their funds are being held by the state.

To be clear, the court is not suggesting that the creation of the CSF trust account and Class Counsels' agreement to help class members recoup their escheated funds is valueless.  Creating the CSF trust account provides recognizable benefit to the class by setting up a single unified fund to which class members can easily turn to recoup their unredeemed money transfers.  Likewise, Class Counsels' agreement to assist class members in recovering their escheated funds has some economic value—although the fact that these class members did not respond to Western Union's notice that their unredeemed funds may escheat to the state likely renders this value negligible.

All said, however, given the practical reality that many class members will not make claims now or in the future, whether through the settlement or through state escheatment procedures, the creation of the CSF trust account provides a means for the implementation of the

---

[8] To be sure, as a practical matter, these class members were unlikely to avail themselves of this right—they already failed to request a refund of their unclaimed money transfers after notice was sent by Western Union that those funds would escheat if not claimed.  It seems just as unlikely that these class members will exercise this right upon Class Counsel sending a similar notice, unless significant efforts are made to update location information for the depositors.

remaining elements of this settlement that are, in this court's opinion, of more importance and which have more far reaching value to Western Union customers than just providing a mechanism for return of their own money.  However, those elements should be valued in their own right as set forth below for purposes of determining a reasonable attorneys' fee award.

This court concludes that, because class members had a right to recoup their unredeemed money transfers prior to this litigation, valuing this relief on a dollar-to-dollar basis to the value of class members' unredeemed funds would unreasonably inflate the economic benefit of this relief to the detriment of the class.  Further, the indirect economic value derived from the creation of the CSF trust account upon the other elements of the settlement is better considered as a "relevant circumstance" in valuing the remaining facets of the settlement to determine an appropriate attorneys' fee award.

### c.   *Interest on Unclaimed Deposits*

Ultimately, the court finds that the primary benefits conferred on the class by the Settlement are (1) the approximately $19 million in interest that Western Union earned off class members' uncompleted money transfers and has agreed to return to class members, and (2) the forward-looking injunctive relief requiring that Western Union provide customers with notice that their money transfers were unsuccessful within 60-90 days of the initial transfer attempt.

Turning first to the interest, there is no dispute that the total amount of interest that accrued on class members' unclaimed funds during the relevant period is approximately $19 million.  Unlike the aggregated sum of class members' unclaimed money transfers (regardless of whether those funds escheated to the state), class members did not have a preexisting right to

recoup the interest Western Union accrued on their unredeemed money transfers.  In other words, absent the Settlement—or, alternatively, a trial verdict that Western Union was unjustly enriched by generating interest income on funds that belonged to class members—class members would not have been entitled to receive this interest.  Indeed, it is noteworthy that Judge Kane has described this case as a class action "for return of interest income earned on unredeemed wire transfers."  (Tr. of Oral Arg. on Mot. Compel Arbitration, Doc. No. 159, at 3:4-5.)  Thus, this aspect of the Settlement would not have existed absent class counsel's efforts and is properly considered as a primary component of the common fund.

***d.*     *Injunctive Relief***

The court also finds that the injunctive relief featured in the Settlement represents a significant and distinct benefit to the class members, many of whom are likely to remain Western Union customers.  Without Class Counsels' efforts in this litigation, Western Union's practice of waiting until required by state escheatment laws to notify customers that their money transfers went uncompleted would likely have continued—thereby depriving future Western customers of the time value of their money.  Indeed, this forward-looking relief may be the most significant benefit of the Settlement as it corrects a practice that, in this court's opinion, was clearly intended as a mechanism to profit off of unredeemed money transfers without class members' knowledge.

The question, however, is whether it is appropriate for the court to assign an economic value to the injunctive relief for purposes of determining a reasonable attorneys' fee award.  It does not appear that the Tenth Circuit has addressed this question and other decisions conflict on

19

this issue.  For example, the United States Court of Appeals for the Ninth Circuit has opined that "because the value of injunctive relief is difficult to quantify, its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund."  *Stanton v. Boeing,* 327 F.3d 938, 974 (9th Cir. 2003).  The *Stanton* court therefore held that "only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees."  *Id.*  In other instances, "courts should consider the value of the injunctive relief obtained as a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees" or "use the common fund version of the lodestar method either to set the fee or as a cross-check."  *Id.; see also In re LivingSocial Marketing and Sales Practice Litigation,* --- F.R.D. ----, 2013 WL 1181489, at *15-16 (D.D.C. 2013) (considering injunctive relief as a "relevant circumstance" to an attorneys' fee award instead of increasing the common fund by the purported value of the injunctive relief).

On the other hand, in *McCoy v. Health Net, Inc.,* 569 F. Supp. 2d 448, 478 (D.N.J. 2008), the court included the value of injunctive relief as part the common fund, even though that value could "not be precisely and mathematically ascertained as to each Class Member" in the same manner as a traditional monetary common fund.  In *McCoy,* the plaintiff class alleged that Health Net, Inc., a health insurance provider, failed to pay all benefits due to its insureds by relying on a flawed database that chronically undervalued the usual, customary, and reasonable charge for medical services.  *Id.* at 450-51.  In addition to a sizeable cash fund, the Settlement Agreement

provided injunctive relief in the form of a requirement that any future benefits paid based on a valuation from the database would be subject to an automatic 14.5% increase.  *Id.* at 452-54. The injunctive relief also included a special appeals process for patients who still had a large outstanding balance even after this 14.5% add-on.  *Id.* at 453-54.

The *McCoy* court elected to assign a value to this injunctive relief for purposes of applying the percentage of the fund method because class members would reap "a very real and very important financial benefit from these aspects of the relief."  *Id.* at 478.  As such, the court concluded that "the value of the injunctive relief [was] a highly relevant circumstance in determining what percentage of the common fund class counsel should receive as attorneys' fees."  *Id.*  Therefore, even though the parties could only "fairly value the injunctive relief at between $26 million and $38 million," the court used this valuation and incorporated it into the common fund for purposes of determining an appropriate fee award.  *Id.*; *see also Sheppard v. Consolidated Edison Co. of New York,* No. 94-CV-0403(JG), 2002 WL 2003206, at *7 (E.D.N.Y. 2002) (including "an estimated $5 million in non-monetary, injunctive relief" as part of common fund for purposes of awarding attorneys' fees).

The court elects to value the injunctive relief for purposes of including it in the common fund and, thereafter, determining an appropriate attorneys' fee award.  As in *McCoy,* the court finds that the agreed-upon injunctive relief in this case constitutes a very important form of relief for the class.  First, the injunctive relief provides for notice of unclaimed deposits to its customers within a time period where a customer's address and contact information is more likely to be current and therefore it is more likely that the customer will actually know that his

money was not successfully transferred.  By creating a significant likelihood that customers will seek a refund within months, instead of years, after their money transfers fail, it will substantially thwart a business practice that deprived class members of hundreds of millions of dollars of their own money.  This allows class members, rather than Western Union, to recognize the time value of that money.  In addition, it substantially prevents Western Union from assessing millions of dollar of service fees that were previously assessed beginning on the date of the uncompleted money transfers until the funds are either returned to customers or escheated.

Further, the court finds that the alternatives to assigning a value to the injunctive relief would not necessarily result in a more accurate fee award.  First, following the percentage of the fund method, but considering the injunctive relief as only a "relevant circumstance," would require that the court base an attorneys' fee award solely on the $19 million in interest Western Union has agreed to provide to class members.  In this court's opinion, this would severely undervalue class counsel's efforts in obtaining the injunctive relief and other benefits included in the Settlement Agreement.

Second, although the court is not dismissive of *Stanton's* discussion of the risk of subjectivity inherent in assigning a monetary value to injunctive relief, similar criticisms have been raised with respect to the lodestar method.  *Lucken Family Ltd. P'ship,* 2010 WL 5387559, at *2 (citing *Brown,* 838 F.2d at 484).  In addition, applying the lodestar method would require that the court engage in the enormous task of reviewing thousands of time entries, covering several years of litigation, to ensure that those entries represent time well-spent.  *Cf. Malloy v. Monahan,* 73 F.3d 1012, 1018 (10th Cir. 1996) (a request for attorneys' fees should not result in

22

a second major litigation).  Finally, as will be seen from the court's analysis below, it is feasible

to fashion a reasonable value for the injunctive relief.  Therefore, although the court is cognizant

that it may not be able to ascertain a *precise* value for the injunctive relief included in the

Settlement Agreement, on the facts of this case, the court finds it proper to assign a reasonable

value thereto for purposes of determining Class Counsels' fee.

 Class Counsel argues that the injunctive relief included in the Settlement Agreement is

worth $187,897,173.  In support of that conclusion, they submit the Affidavit of Mr. Johnson, a

certified public accountant with over 40 years of experience.  (Johnson Aff. ¶¶ 3-4.)  Based on

data provided by Western Union regarding the uncompleted money transfers from 2005 to 2009,

Mr. Johnson has projected the various cash flows and the resulting funds that would have

occurred absent the injunctive relief.  (*Id.* ¶¶ 15, 18)  In particular, Mr. Johnson has projected the

amount of interest that Western Union would accrue from uncompleted transfers, the amount of

service fees that Western Union would collect, and the amount of funds that would escheat to the

state in the absence of the injunctive relief.  (*Id.* ¶¶ 20-31.)  He then adjusted those numbers to

their present value and concludes that, in the absence of the injunctive relief, Western Union

would accrue $10,666,814 in interest and $35,893,782 in service funds, and that $141,336,577

would escheat to the state.  (*Id.* ¶¶ 16, 32.)  Thus, Mr. Johnson concludes that economic impact

of the injunctive relief can be valued at the sum of these values, or $187, 897,173.  (*Id.* ¶¶ 16,

33.)

 The court agrees with Mr. Johnson's methodology as a general matter; however, for

substantially the same reasons discussed in subsections (a) and (b) above, the court disagrees that

value of the injunctive relief should include the value of the funds that would escheat to the state in the absence of the injunctive relief.  More specifically, as with class members' funds in the CSF trust account, as well as those funds that have already escheated to the state, class members have and will always have a right to recoup their uncompleted money transfers—the injunctive relief does not affect that right.[9]  Rather, the primary effect of the injunctive relief will be to provide class members with notice of their outstanding money transfers much sooner after the transfer goes unredeemed.  The proper way to monetize this difference in the timing of notice to customers is the time value of money that class members gain through the earlier access to their uncompleted money transfers—i.e., the interest that Western Union would no longer earn (and that class members could earn) on the balance of the money transfers.

Additionally, the sum of the service or administrative fees that Western Union would otherwise charge in the absence of the notification injunctive relief is an appropriate component of the value of the injunctive relief.  By giving class members notice that their money transfers have failed within the first 60 to 90 days, the injunctive relief will substantially prevent Western Union from recouping these service fees from the initial deposits prior to redemption or escheatment to the detriment of its customers who are never notified that such fees are accruing.  Therefore, because the prevention of these fees in the future is a clear benefit to class members, the present value of those fees is properly included as part of the value of the injunctive relief.

---

[9] Of course, the court recognizes that providing earlier notice will likely improve the rate of redemption by customers.  However, any value to be assigned to this facet is too speculative and therefore the court declines to subjectively inflate the fund on this basis.

Altogether, including the present value of the interest and the administrative fees, but excluding the present value of the escheated funds, the injunctive relief can be properly valued at $46,560,596. Adding this value to the $19 million in interest class members may recoup from Western Union, the court finds that the total benefit to class members of the Settlement, i.e., the "common fund," is properly valued at $65,560,596. For reasons discussed further below, the court finds it proper to award Class Counsel 35% of this fund for a total attorneys' fee award of $22,946,208.

### 2.    *Johnson Factors*

The court next considers the *Johnson* factors to ensure that the recommend fee is reasonable. These factors are

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee—this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Johnson,* 488 F.2d at 717-19; *see also Anderson,* 2009 WL 3378526, at *2.

On balance, the court finds that the *Johnson* factors demonstrate that the recommended fee of $22,946,208 is reasonable. As a threshold matter, the court finds that the seventh and eleventh *Johnson* factors are not particularly relevant in this case—indeed, Class Counsel has not submitted any argument on these points. *Brown,* 838 F.2d at 456 (rarely are all of the *Johnson* factors applicable and this is particularly true in common fund cases).

25

As to the fourth *Johnson* factor, the time spent on this case by Class Counsel without a doubt came at the expense of time that they could have spent on other cases.  However, Class Counsel does not point to any particular cases that were turned away because of the demands of this case.  Thus, while it is fair to assume that Class Counsels' efforts on this case could have been devoted to other cases, this assumption does not weigh heavily in the court's analysis.

The sixth *Johnson* factor also does not appear to be pivotal.  Although Class Counsel pursued this case on a contingency fee basis that provided that Class Counsel would request a fee award of up to 33 percent of any recovery, the court has elected to award a fee at a higher percentage (35 percent) of the economic benefit to the class.

A number of the remaining factors certainly tip in Class Counsels' favor.  This case required Class Counsel to investigate and analyze a number of novel and difficult issues, including, but not limited to:  Western Union's complex corporate structure, including the complicated method by which it handles unclaimed funds and the escheatment process; the escheatment laws of various states; whether Colorado law governed the claims of all class members on a nationwide basis; and complicated questions as to whether arbitration of class members' claims should be compelled.  And, of course, Class Counsel spent a significant amount of time and effort negotiating a settlement Judge Kane described as "remarkable." (Final Fairness Hrg. Tr., Doc. No. 257, at 29:25.)

Complicating the settlement of this case was the interest expressed by a significant number of jurisdictions to whom class members' escheated funds were or would be ultimately delivered.  As noted, escheated funds over the time period involved in the case alone amounted

26

to more than $83 million and the potential escheatment affected by the injunctive relief amounted to more than $141 million.  Class Counsel found it necessary to deal with numerous offices of state attorney generals who were not elated by the prospect of losing this significant source of income, however undeserved.  The inclusion of the *cy pres* recommendation in the settlement was a novel compromise to stave off further litigation over this touchy subject.

In total, Class Counsel expended over 13,000 hours on this case over approximately four years drafting several iterations of the operative class action complaint; litigating several motions to dismiss; conducting significant discovery into issues of waiver and enforceability of arbitration clauses; and submitting lengthy and contentious briefing on the motion to compel arbitration.  Moreover, in light of the novel and complex issues that arose in this case, as well as the complexity of class action litigation in general, a high level of skill was required to litigate this action.

Plaintiffs' lead counsel and the supporting firms were more than up to this task.  Indeed, the resumes attached to Class Counsels' Notice of Lodestar Calculation demonstrates that each of the law firms comprising Class Counsel possess a strong reputation and a wealth of qualifications and experience for such complex litigation.

Nevertheless, the court finds that the remaining *Johnson* factors support the court's recommended fee which, on the whole, is substantially less than the $40.5 million requested. For starters, Class Counsel argue that the absence of "copycat" lawsuit demonstrates that this case was undesirable and risky.  However, if the court were to adopt the theory supporting Class Counsels' proposed fee would suggest that there was little, if any risk, in filing this lawsuit.

More specifically, because Western Union never disputed that class members had a right to recoup the unredeemed money transfers that comprise the Class Settlement Fund, there was no question at all that class members would be entitled to the $135 million placed in the CSF trust account if class members were to simply make a claim. Other law firms surely would have filed copycat lawsuits had they known they would be compensated with a percentage of a sizable fund which already unquestionably belonged to the class members.

The real risk in this lawsuit involved whether (1) arbitration clauses in the money transfer documents would be enforceable and would eliminate the possibility of forming a class, (2) the class would be entitled to the interest accrued by Western Union on their unredeemed money transfers on a theory of unjust enrichment, and (3) the court would enter injunctive relief barring Western Union from continuing the lucrative but anti-consumer business practice that is the subject of this suit. As a consequence, and as discussed extensively above, the $19 million in interest and the economic value of the injunctive relief represents "the amount involved and the results obtained." *Brown,* 838 F.2d at 456 ("[T]he amount involved and the results obtained may be given greater weight when . . . the recovery was highly contingent and the efforts of counsel were instrumental in realizing recovery on behalf of the class.").

From a percentage of the fund perspective, the customary fee in this District is approximately one-third of the total economic benefit to the class. *Lucken Family Ltd. P'Ship,* 2010 WL 5387559, at *5-6; *Anderson,* 2009 WL 3378526, at *3. Here, the court finds it appropriate to award 35 percent of the economic benefit bestowed on the class, rather than the 30 percent requested by Class Counsel. The court finds this increase necessary in order to

adequately compensate Class Counsel for not only the direct benefits to the class as noted herein, but also to compensate for (1) their efforts in creating the CSF trust account which, given the historical redemption rate of only 15% after notice, is large enough to satisfy the class obligations (which hopefully will result in at a least a slightly higher redemption rate), the attorneys' fees, and other costs of administration, as well as pacify state authorities through the existence of a *cy pres* award; (2) assisting class members in recouping the funds that have escheated; (3) obtaining a separate fund for payment of interest for all class members from Western Union and ensuring that payment is made; and (4) their future efforts defending the settlement on appeal and administering the settlement and class members' claims.

A lodestar cross-check further reinforces that the court's recommended fee award is in line with the customary fee in this District.  According to their Notice of Lodestar Calculation, Class Counsel and their employees spent 13,006.8 hours pursuing and resolving this litigation against Western Union.  Based on the law firms' current billing rates, the billable value of these hours is $8,076,308.  Class Counsel further estimates that defending this matter on appeal, administering the settlement and claims process, and assisting class members whose money has escheated to the state will result in an additional $1,375,000 of billable time.

Adding together the billable value of the hours expended thus far by class counsel and the estimated billable value of Class Counsel's future efforts results in a total of $9,451,308.  Of course, this number does not constitute a true lodestar amount, as the court has not undertaken the extensive determination of whether Class Counsel's billing rates or individual billing entries are reasonable.  Under the lodestar multiplier approach, courts typically award multipliers of 2 to

3 times the lodestar.  *Lucas v. Kmart Corp.,* No. 99-cv-01923-JLK-CBS, 2006 WL 2729260, at

*6 (D. Colo. July 27, 2006).  The $22,946,208 recommended fee represents a multiplier of 2.42

of Class Counsel's best day in court concerning its billable hours and rates.  Obviously, the

multiplier would increase if the court were to disallow any of the hours billed or cut the hourly

rates of any of the lawyers or staff.  As such, a lodestar cross-check confirms that the recommend

fee of $22,946,208 is in line with the customary fee in this District.  *Id.*

Altogether, the *Johnson* factors demonstrate that the recommend fee is reasonable.

Accordingly, for the reasons discussed above, the court recommends that Class Counsel be

awarded a fee of $22,946,208, pursuant to Federal Rule of Civil Procedure 23(h).

### C.    *Incentive Awards*

The Motion for Attorneys' Fees also requests that the court authorize incentive awards to

each named class representative totaling $30,000 as follows:  $7,500 to James P. Tenille, $7,500

to Robert Smet, $7,500 to Adeliada DeLeon, and $7,500 to Yamilet Rodriguez.  Each Class

Representative has been actively involved in this litigation including conferring with Class

Counsel about the case and its ultimate settlement, producing documents, and appearing for

depositions.

The purpose of incentive awards for class representatives is to encourage people with

significant claims to pursue actions on behalf of others similarly situated.  *In re Cardizem CD

Antitrust Litigation,* 218 F.R.D. 508, 535 (E.D. Mich. 2003).  "Numerous courts have recognized

that incentive awards are an efficient and productive way of encouraging members of a class to

become class representatives, and in rewarding individual efforts taken on behalf of the class."
*Droegemueller,* 2009 WL 961539, at *5 (citing cases).

As discussed above, the court has valued the Settlement in this case at approximately $65.5 million dollars.  The court finds that the requested incentive awards to the Class Representatives, in the total amount of $30,000, are reasonable and consistent with incentive awards in other class litigation.  *Id.* (approving $25,000 incentive awards where settlement was valued at approximately $16 million); *Lucken Family Ltd. P'ship,* 2010 WL 5387559, at *6 (approving $10,000 incentive award to sole class representative where common fund was valued at approximately $11 million); *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir. 1998) (approving incentive award of $25,000 for named plaintiff where settlement was valued at $13 million); *Whittington v. Taco Bell of Am., Inc.,* No. 10-cv-1884-KMT-MEH, 2013 WL 6022972, at *6 (D. Colo. Nov. 13, 2013) (approving incentive award of $7,500 to sole class representative in FLSA collective action where settlement was valued at approximately $2.5 million).  Accordingly, the court finds that the requested incentive award of $7,500 to each Class Representative, totaling $30,000, is properly approved.

WHEREFORE, for the foregoing reasons, I respectfully

RECOMMEND that "Defendants' Motion to Strike and Request for Attorneys' Fees" (Doc. No. 208) be DENIED and that "Plaintiffs' Motion of Class Counsel for Approval of Attorneys' Fees, Costs, and Expenses and for Approval of Incentive Awards" (Doc. No. 195) be GRANTED in part as follows:  The court RECOMMENDS that Class Counsel be awarded

Appellate Case: 14-1432    Document: 01019356384    Date Filed: 12/15/2014    Page: 105

attorneys' fee totaling $22,946,208 and that the incentive award of $7,500 to each Class

Representative, totaling $30,000, be approved.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may

serve and file written objections to the Magistrate Judge's proposed findings and

recommendations with the Clerk of the United States District Court for the District of Colorado.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A

general objection that does not put the district court on notice of the basis for the objection will

not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's

report and recommendation must be both timely and specific to preserve an issue for de novo

review by the district court or for appellate review." *United States v. One Parcel of Real Prop.*

*Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to

make timely objections may bar *de novo* review by the district judge of the magistrate judge's

proposed findings and recommendations and will result in a waiver of the right to appeal from a

judgment of the district court based on the proposed findings and recommendations of the

magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's

decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection

does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at

1059-60 (a party's objections to the magistrate judge's report and recommendation must be both

timely and specific to preserve an issue for *de novo* review by the district court or for appellate

review);  *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 31st day of December, 2013.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge

33

Appellate Case: 14-1432   Document: 01019356384   Date Filed: 12/15/2014   Page: 107

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
### Judge John L. Kane

Civil Action No. **09-cv-00938-JLK-KMT** (consolidated with No. 10-cv-00765-JLK)

**JAMES P. TENNILLE, ROBERT SMET, ADELAIDA DELEON and YAMILET**

**RODRIGUEZ**, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

**THE WESTERN UNION COMPANY and WESTERN UNION FINANCIAL SERVICES, INC.**,

Defendants.

---

## ORDER MODIFYING MAGISTRATE JUDGE'S RECOMMENDATION re ATTORNEY FEES

---

Kane, J.

This nationwide class action was the subject of a global settlement approved on

June 24, 2013. Under the terms of the settlement, Western Union agreed to disgorge all of

the remaining unclaimed wire transfer funds in its possession and deposit them into a

Class Settlement Fund (CSF) for disbursement to class members.  Until the settlement,

Western Union's business practice had been to hold onto unclaimed funds for as long as

possible, leveraging them for interest income until customers either discovered the

transfer failure and asked for their money back or the funds escheated under state

unclaimed property statutes. In addition to the creation of the CSF, the settlement also

1

wrought wholesale changes to the way Western Union agreed to do business in the future. Specifically, Western Union agreed that from the date of settlement forward it would no longer keep mum when attempted transfers failed, but would notify customers within 60 days and facilitate the funds' return.  Finally, Western Union agreed to reimburse class members for the time value of their unclaimed transfer funds withheld – to the tune of $19 million – and to pay small incentive awards to individual class representatives. Victory for class members and current and future Western Union customers worldwide was virtually complete.  At the final approval hearing, I described the settlement as "remarkable."

The question of attorney fees was cleaved from the settlement, with the Agreement providing simply that Class Counsel would "file an application" for reasonable attorney fees and case expenses within 45 days of the final approval hearing. Stipulation and Agreement of Compromise and Settlement, ¶ 5A (Doc. 172-2, p. 29/48). The Agreement specifically provided that Western Union would have the right to object. *Id.*

Class Counsel filed its Motion for Approval of Attorney Fees, Costs, and Expenses and for Approval of Incentive Awards on April 30, 2013 (Doc. 195), requesting a fee award equal to "30% of the Class Settlement Fund as determined by the Court pursuant to the Settlement Agreement" plus $7500 in incentive awards for individual class representatives.  At the time, the CSF was estimated at a $180 million cash value,

resulting in a fee request in the area of $54 million.[1] Because the CSF included neither the

$19 million in interest nor any dollar value for the change in business practices, Class

counsel argued their fee request was both conservative and reasonable.

The request met with opposition, less from individual class members than from

Western Union, which denied the CSF constituted any new "benefit" to the Class because

it was comprised of funds that never lost their character as property of the class and were

always either eventually returned or left to escheat to the state.  The only "new" and

quantifiable[2] benefit of the settlement, according to Western Union, was the $19 million

in interest income Western Union agreed to refund. Accordingly, Western Union argued

the fee award in this case should be limited to a percentage of the $19 million in returned

interest and nothing more.  In addition, Western Union sought to strike the affidavits of

Plaintiffs' forensic accountant, R. Larry Johnson (Doc. 200), and class action specialist

Brian T. Fitzpatrick (Doc. 197), "and all references in the Fees Motion to either." *See*

Motion to Strike (Doc. 208) at 2. Mr. Fitzpatrick's affidavit supported the use of the CSF

as the "common fund" basis for awarding fees in this case and the reasonableness of

---

[1]  Over time, any diminution in the cash value of the CSF as a result of interim escheatment of funds to the state would decrease the amount of the fee award.  Class Counsel therefore busied itself negotiating individual stays of action on escheatment statutes with individual states.

[2]  The possibility that individual class members might recoup funds that had already escheated to the states, or might benefit from the prospective relief by remaining Western Union customers whose transfers may fail to complete in the future, were too tangential and too speculative, according to Western Union, to constitute quantifiable benefits, conferred by the settlement, on the existing class.

Class Counsel's request given the substantial additional benefits obtained, and Mr. Johnson's affidavit provided an economic basis for assigning a present monetary value to the prospective relief to support the conservative nature of the CSF-based fee request.

I referred the Motion for Fees, the related Responses and Objections, and the Motion to Strike to Magistrate Judge Tafoya for recommendation.  In a written decision dated December 31, 2013 (Doc. 315), the Magistrate Judge denied the Motion to Strike, considered the subject affidavits, and recommended a fee award of $22,946,208 – less than half the amount Class Counsel requested.  The decision was lengthy and complex, reflecting a compromise between the two sides' positions.  The Magistrate Judge adopted Western Union's critique that CSF was comprised of funds that "already" belonged to the Class and was therefore not a benefit "conferred by the Settlement," but used Mr. Johnson's affidavit to assign a $46.5 million value to the prospective relief.  Finding many class members "were likely to remain" Western Union customers, the Magistrate Judge rejected Western Union's contention that the prospective relief provided no benefit to the existing class.  The Magistrate added the present value of the prospective relief to the $19 million in interest, and recommended a fee award equal to 35% of that combined "common fund."  With the individual incentive awards, the total recommended fee award was $22,946,208.

Both sides were unhappy with the Recommendation. Plaintiffs challenged the decision to exclude the CSF from the calculus of benefits conferred by the settlement, and Western Union reiterated its position that the only new and quantifiable benefit conferred

4

by the Settlement was the requirement that Western Return to class members the $19 million in interest on unclaimed transfer funds that Western Union would otherwise have kept for itself.  I set the matter for oral argument on September 3, 2014, expressing concern at the tenuous nexus on which the Magistrate Judge's prospective relief present value calculations depended and disagreeing that the CSF added no "new" or actual value to the Class.  At the conclusion of arguments that day, I took the matter under advisement. I issue my rulings below.

*Standard of Review.*

My review of the Magistrate Judge's Recommendation is *de novo* under Fed. R. Civ. P. 72(b) as to the portions of the Recommendation to which written objection is made, and I may accept, reject, or modify the Recommendation under that standard.  I have thoroughly considered the written and oral arguments of counsel, together with the divergent opinions and analyses of various experts.  I am persuaded by Professor Fitzpatrick's concise and well reasoned analysis and expertise that Class Counsel's fee request is both reasonable and appropriate.  I therefore GRANT Class Counsel's Motion for Attorney Fees and ORDER an award of fees equal to 30% of the CSF.

*Background.*

The Settlement Agreement provided four specific types of relief for class members:  (1) the placement of all unclaimed transfer funds still in Western Union's possession on the date of Final Approval in a Class Settlement Fund (CSF) trust account for return to transferors; (2) notification to class members whose unclaimed funds had

already escheated to the state of that fact and the establishment of a Class Counsel-assisted process for recovering them; (3) a lump sum payment, on submission of a valid claim form, to individual class members equal to the amount of interest accrued on their unclaimed moneys; and (4) a change in Western Union's policies and practices going forward requiring notice to individual customers within 60-90 days that transfers were not redeemed.  In recognition of their efforts on behalf of the class, the Settlement Agreement also called for the payment of $7,500 to each of the Class Representative Plaintiffs as an incentive award.  The Agreement provided that any funds remaining in the CSF account after full payment of all valid claims, fees, incentive awards and attorney fees and expenses would be placed into a *cy pres* fund subject to distribution upon court order.

Class Counsel's original Motion sought an award of 30% of the total value of the CSF under the theory that the CSF constituted a straightforward and conservative estimate of the "common fund" of benefits conferred by the settlement through Class Counsel's efforts.  The Magistrate Judge disagreed, reasoning that unclaimed transfer funds had always been returnable to customers on demand and that the real benefit of the litigation was in the recoupment of the *interest* Western Union earned on those funds while wrongfully holding onto them and the injunctive relief that will prevent Western Union from taking advantage of its customers in this manner in the future.

The principal objection at issue is Class Counsel's assertion that, by excluding the CSF from the "common fund" of benefits conferred by the Settlement, the Magistrate Judge ignored the real and actual value the recoupment of those monies represent and

6

thereby undervalued Class Counsel's efforts to a significant degree.  Defendants object to the recommended fee award to the extent it is premised on a speculative valuation of what the prospective relief means to the former Western Union customers that form the membership of the Class. Both objections have merit.[3]

*Discussion.*

I incorporate the Magistrate Judge's statement of the case and procedural history at pages 2-7 of her Recommendation.  Briefly recounted, this litigation posed a nationwide challenge to Western Union's practice of declining to notify customers when an attempted wire transfer went unclaimed.  Western Union would hold the funds, generating interest income for itself, returning the principal – for a fee – when the customer realized the failure or when state unclaimed property statutes required Western Union to attempt repatriation.  When repatriation efforts were unsuccessful, Western Union allowed unclaimed funds to escheat to the state.

The parties engaged in robust motions practice over a period of years to narrow their claims and defenses.  Class status, jurisdiction, and venue were all challenged.  Settlement was reached while an order denying Defendants' motion to compel individual class members to arbitrate their claims was on appeal to the Tenth Circuit.  The Plaintiff Class was comprised of thousands of individuals with relatively small individual losses.

---

[3]  Other objections were received from Class members Paul Dorsey (Docs. 317, 321) and Albert Bacharach (Docs. 324).  I have benefitted from each objector's thoughts and comments in making my ruling regarding fees, but neither changes my ultimate decision.

But for the creativity and perseverance of Class Counsel, these losses would have gone unremedied and the way business was conducted at Western Union would have continued to enrich the company at the expense of their individual, often indigent, customers. The settlement achieved very real and comprehensive relief for individual Class members and for all Western Union customers now and into the future. It was, as I characterized it at the final approval hearing, a "remarkable" result.

While I understand the Magistrate Judge's view that the CSF included funds that "always belonged" to Class member transferors and which Western Union would never ultimately or permanently retain, I do not agree that these funds may not therefore form the basis for a fee award. While technically correct, the Magistrate Judge's view fails to recognize the practical effect of the successful actions taken by Plaintiffs' counsel. In the real world, the amounts owed to each member of the class are small, thus detracting from an incentive to comply with the detailed requirement for refund, and the anticipated delays in receiving payment. So, too, the transient habits of many customers who actually use wire transfer services suggest that without notice and assistance developed through collection efforts, the return of these funds is highly speculative, if not, indeed, aspirational. The value of the Class Settlement Fund puts the bird in the hand rather than in the bush. It cannot be demonstrated, as a practical matter, that simply because the funds are locatable that they can be retrieved without additional, probably preclusive, cost and effort.

As stated above, I am persuaded by the Declaration of Professor Brian T.

8

Fitzpatrick and his view, after thoroughly evaluating the fee request in light of the

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) factors and his

comprehensive empirical study of class action settlement and fee awards, that the fee

request is well within the ambit of reasonableness and propriety.  Thirty percent of the

cash portion of the settlement is a lower percent than has been used in other cases and

well within the range accepted by the Tenth Circuit Court of Appeals. This is especially

true where, as here, the cash fund is but one aspect of the settlement and therefore

understates the real and actual value realized.  That these benefits are difficult to reduce to

actual or present monetary value does not mean they were not conferred.  They were, and

Class Counsel deserves credit for that.

I am also convinced, however, of the folly in attempting to reduce to a dollar

amount the present value of the prospective relief obtained in the Settlement.  One look at

the assumptions, regression analyses, probabilities, and caveats employed to attribute a

value, to the Plaintiff Class of *past* Western Union customers, of a change in business

practices that does not take effect until the date of Settlement and beyond, portends

nothing but further appeal and uncertainty.  Class Counsel's original fee request is the

best and most reliable basis on which to calculate a reasonable fee award in this case, and

I adopt it without reservation. Based on the foregoing, IT IS ORDERED THAT

    1.  Class Counsel's Motion for Attorney Fees (Doc. 195) is GRANTED;

    2.  Western Union's Motion to Strike the Affidavits of Messrs. Fitzpatrick and

Johnson and Request for Attorney Fees (Doc. 208) is DENIED;

3.  Class Counsel's Motion to Strike the expert opinions of Professor Shavell and Michael J. Gallagher (Doc. 350) is DENIED as MOOT.

IT IS FURTHER ORDERED THAT Class Counsel and Western Union shall CONFER and Class Counsel shall PREPARE a Proposed Order awarding Counsel's requested fees, costs, and incentive payments for the Court's signature.  The Proposed Order shall be filed in the normal course in the Court's CM/ECF filing system and submitted in editable formal to the Kane Chambers email account.  The Proposed Order is due on or before October 4, 2014.  Counsel are congratulated on jobs exceedingly well done.

Dated September 23, 2014.

**s/John L. Kane**
SENIOR U.S. DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **09-cv-00938-JLK-KMT** (consolidated with No. 10-cv-00765-JLK)

**JAMES P. TENNILLE, ROBERT SMET, ADELAIDA DELEON and YAMILET RODRIGUEZ**, individually and on behalf of all others similarly situated,

    Plaintiffs,

v.

**THE WESTERN UNION COMPANY and WESTERN UNION FINANCIAL SERVICES, INC.,**

    Defendants.

---

**AMENDED ORDER MODIFYING MAGISTRATE JUDGE'S RECOMMENDATION re ATTORNEY FEES\***

---

Kane, J.

    This nationwide class action was the subject of a global settlement approved on June 24, 2013. Under the terms of the settlement, Western Union agreed to disgorge all of the remaining unclaimed wire transfer funds in its possession and deposit them into a Class Settlement Fund (CSF) for disbursement to class members.  Until the settlement, Western Union's business practice had been hold onto unclaimed funds for as long as possible, leveraging them for interest income until customers either discovered the transfer failure and asked for their money back or the funds escheated under state unclaimed property statutes. In addition to the creation of the CSF, the settlement also

1

wrought wholesale changes to the way Western Union agreed to do business in the future.

Specifically, Western Union agreed that from the date of settlement forward it would no

longer keep mum when attempted transfers failed, but would notify customers within 60

days and facilitate the funds' return.  Finally, Western Union agreed to reimburse class

members for the time value of their unclaimed transfer funds withheld – to the tune of

$19 million – and to pay small incentive awards to individual class representatives.

Victory for class members and current and future Western Union customers worldwide

was virtually complete.  At the final approval hearing, I described the settlement as

"remarkable."

The question of attorney fees was cleaved from the settlement, with the Agreement

providing simply that Class Counsel would "file an application" for reasonable attorney

fees and case expenses within 45 days of the final approval hearing. Stipulation and

Agreement of Compromise and Settlement, ¶ 5A (Doc. 172-2, p. 29/48). The Agreement

specifically provided that Western Union would have the right to object. *Id.*

Class Counsel filed its Motion for Approval of Attorney Fees, Costs, and Expenses

and for Approval of Incentive Awards on April 30, 2013 (Doc. 195), requesting a fee

award equal to "30% of the Class Settlement Fund as determined by the Court pursuant to

the Settlement Agreement" plus $7500 in incentive awards for individual class

representatives.  At the time, the CSF was estimated at a $180 million cash value,

resulting in a fee request in the in the area of $54 million.[1] Because the CSF included neither the $19 million in interest nor any dollar value for the change in business practices, Class counsel argued their fee request was both conservative and reasonable.

The request met with opposition, less from individual class members than from Western Union, which denied the CSF constituted any new "benefit" to the Class because it was comprised of funds that never lost their character as property of the class and were always either eventually returned or left to escheat to the state.  The only "new" and quantifiable[2] benefit of the settlement, according to Western Union, was the $19 million in interest income Western Union agreed to refund. Accordingly, Western Union argued the fee award in this case should be limited to a percentage of the $19 million in returned interest and nothing more.  In addition, Western Union sought to strike the affidavits of Plaintiffs' forensic accountant, R. Larry Johnson (Doc. 200), and class action specialist Brian T. Fitzpatrick (Doc. 197), "and all references in the Fees Motion to either." *See* Motion to Strike (Doc. 208) at 2. Mr. Fitzpatrick's affidavit supported the use of the CSF

---

[1] According to the Settlement Agreement, the actual amount of the CSF would be calculated as of the "date of Final Approval."  (Doc. 172-2 at 9.)  According to Defendants' letter submission to the Court dated May 28, 2013 (Doc. 219), the actual value of the CSF as of the date of Final Approval was approximately $133 million.  The decrease in the amount of the CSF was the result of interim escheatment of funds to the state. As a result, Class Counsel's fee request of 30% of the CSF results in a requested fee award of approximately $39.9 million.

[2] The possibility that individual class members might recoup funds that had already escheated to the states, or might benefit from the prospective relief by remaining Western Union customers whose transfers may fail to complete in the future, were too tangential and too speculative, according to Western Union, to constitute quantifiable benefits, conferred by the settlement, on the existing class.

as the "common fund" basis for awarding fees in this case and the reasonableness of

Class Counsel's request given the substantial additional benefits obtained, and Mr.

Johnson's affidavit provided an economic basis for assigning a present monetary value to

the prospective relief to support the conservative nature of the CSF-based fee request.

I referred the Motion for Fees, the related Responses and Objections, and the

Motion to Strike to Magistrate Judge Tafoya for recommendation.  In a written decision

dated December 31, 2013 (Doc. 315), the Magistrate Judge denied the Motion to Strike,

considered the subject affidavits, and recommended a fee award of $22,946,208 – less

than half the amount Class Counsel requested.  The decision was lengthy and complex,

reflecting a compromise between the two sides' positions.  The Magistrate Judge adopted

Western Union's critique that CSF was comprised of funds that "already" belonged to the

Class and was therefore not a benefit "conferred by the Settlement," but used Mr.

Johnson's affidavit to assign a $46.5 million value to the prospective relief.  Finding

many class members "were likely to remain" Western Union customers, the Magistrate

Judge rejected Western Union's contention that the prospective relief provided no benefit

to the existing class.  The Magistrate added the present value of the prospective relief to

the $19 million in interest, and recommended a fee award equal to 35% of that

combined "common fund."  With the individual incentive awards, the total recommended

fee award was $22,946,208.

Both sides were unhappy with the Recommendation. Plaintiffs challenged the

decision to exclude the CSF from the calculus of benefits conferred by the settlement, and

4

Western Union reiterated its position that the only new and quantifiable benefit conferred by the Settlement was the requirement that Western Return to class members the $19 million in interest on unclaimed transfer funds that Western Union would otherwise have kept for itself.  I set the matter for oral argument on September 3, 2014, expressing concern at the tenuous nexus on which the Magistrate Judge's prospective relief present value calculations depended and disagreeing that the CSF added no "new" or actual value to the Class.  At the conclusion of arguments that day, I took the matter under advisement. I issue my rulings below.

### Standard of Review.

My review of the Magistrate Judge's Recommendation is *de novo* under Fed. R. Civ. P. 72(b) as to the portions of the Recommendation to which written objection is made, and I may accept, reject, or modify the Recommendation under that standard.  I have thoroughly considered the written and oral arguments of counsel, together with the divergent opinions and analyses of various experts.  I am persuaded by Mr. Fitzpatrick's concise and well reasoned analysis and expertise that Class Counsel's fee request is both reasonable and appropriate.  I therefore GRANT Class Counsel's Motion for Attorney Fees and ORDER an award of fees equal to 30% of the CSF.

### Background.

The Settlement Agreement provided four specific types of relief for class members:  (1) the placement of all unclaimed transfer funds still in Western Union's possession on the date of Final Approval in a Class Settlement Fund (CSF) trust account

5

for return to transferors; (2) notification to class members whose unclaimed funds had already escheated to the state of that fact and the establishment of a Class Counsel-assisted process for recovering them; (3) a lump sum payment, on submission of a valid claim form, to individual class members equal to the amount of interest accrued on their unclaimed moneys; and (4) a change in Western Union's policies and practices going forward requiring notice to individual customers within 60-90 days that transfers were not redeemed.  In recognition of their efforts on behalf of the class, the Settlement Agreement also called for the payment of $7,500 to each of the Class Representative Plaintiffs as an incentive award.  The Agreement provided that any funds remaining in the CSF account after full payment of all valid claims, fees, incentive awards and attorney fees and expenses would be placed into a *cy pres* fund subject to distribution upon court order.

Class Counsel's original Motion sought an award of 30% of the total value of the CSF under the theory that the CSF constituted a straightforward and conservative estimate of the "common fund" of benefits conferred by the settlement through Class Counsel's efforts.  The Magistrate Judge disagreed, reasoning that unclaimed transfer funds had always been returnable to customers on demand and that the real benefit of the litigation was in the recoupment of the *interest* Western Union earned on those funds while wrongfully holding onto them and the injunctive relief that will prevent Western Union from taking advantage of its customers in this manner in the future.

The principal objection at issue is Class Counsel's assertion that, by excluding the CSF from the "common fund" of benefits conferred by the Settlement, the Magistrate

Judge ignored the real and actual value the recoupment of those monies represent and thereby undervalued Class Counsel's efforts to a significant degree.  Defendants object to the recommended fee award to the extent it is premised on a speculative valuation of what the prospective relief means to the former Western Union customers that form the membership of the Class. Both objections have merit.[3]

*Discussion.*

I incorporate the Magistrate Judge's statement of the case and procedural history at pages 2-7 of her Recommendation.  Briefly recounted, this litigation posed a nationwide challenge to Western Union's practice of declining to notify customers when an attempted wire transfer went unclaimed.  Western Union would hold the funds, generating interest income for itself, returning the principal – for a fee – when the customer realized the failure or when state unclaimed property statutes required Western Union to attempt repatriation.  When repatriation efforts were unsuccessful, Western Union allowed unclaimed funds to escheat to the state.

The parties engaged in robust motions practice over a period of years to narrow their claims and defenses.  Class status, jurisdiction, and venue were all challenged. Settlement was reached while an order denying Defendants' motion to compel individual class members to arbitrate their claims was on appeal to the Tenth Circuit.  The Plaintiff

---

[3]  Other objections were received from Class members Paul Dorsey (Docs. 317, 321) and Albert Bacharach (Docs. 324).  I have benefitted from each objector's thoughts and comments in making my ruling regarding fees, but neither changes my ultimate decision.

Appellate Case: 14-1432     Document: 01019356384     Date Filed: 12/15/2014     Page: 124

Class was comprised of thousands of individuals with relatively small individual losses. But for the creativity and perseverance of Class Counsel, these losses would have gone unremedied and the way business was conducted at Western Union would have continued to enrich the company at the expense of their individual, often indigent, customers.  The settlement achieved very real and comprehensive relief for individual Class members and for all Western Union customers now and into the future.  It was, as I characterized it at the final approval hearing, a "remarkable" result.

While I understand the Magistrate Judge's view that the CSF included funds that "always belonged" to Class member transferors and which Western Union would never ultimately or permanently retain, I do not agree that these funds may not therefore form the basis for a fee award.  While technically correct, the Magistrate Judge's view fails to recognize the practical effect of the successful actions taken by Plaintiffs' counsel.  In the real world, the amounts owed to each member of the class are small, thus detracting from an incentive to comply with the detailed requirement for refund, and the anticipated delays in receiving payment.  So, too, the transient habits of many customers who actually use wire transfer services suggest that without notice and assistance developed through collection efforts, the return of these funds is highly speculative, if not, indeed, aspirational.  The value of the Class Settlement Fund puts the bird in the hand rather than in the bush.  It cannot be demonstrated, as a practical matter, that simply because the funds are locatable that they can be retrieved without additional, probably preclusive, cost and effort.

Appellate Case: 14-1432    Document: 01019356384    Date Filed: 12/15/2014    Page: 125

As stated above, I am persuaded by the Declaration of Professor Brian T. Fitzpatrick and his view, after thoroughly evaluating the fee request in light of the *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) factors and his comprehensive empirical study of class action settlement and fee awards, that the fee request is well within the ambit of reasonableness and propriety.  Thirty percent of the cash portion of the settlement is a lower percent than has been used in other cases and well within the range accepted by the Tenth Circuit Court of Appeals. This is especially true where, as here, the cash fund is but one aspect of the settlement and therefore understates the real and actual value realized.  That these benefits are difficult to reduce to actual or present monetary value does not mean they were not conferred.  They were, and Class Counsel deserves credit for that.

I am also convinced, however, of the folly in attempting to reduce to a dollar amount the present value of the prospective relief obtained in the Settlement.  One look at the assumptions, regression analyses, probabilities, and caveats employed to attribute a value, to the Plaintiff Class of *past* Western Union customers, of a change in business practices that does not take effect until the date of Settlement and beyond, portends nothing but further appeal and uncertainty.  Class Counsel's original fee request is the best and most reliable basis on which to calculate a reasonable fee award in this case, and I adopt it without reservation. Based on the foregoing, IT IS ORDERED THAT

1. Class Counsel's Motion for Attorney Fees (Doc. 195) is GRANTED;

2.  Western Union's Motion to Strike the Affidavits of Messrs. Fitzpatrick and Johnson and Request for Attorney Fees (Doc. 208) is DENIED;

3.  Class Counsel's Motion to Strike the expert opinions of Professor Shavell and Michael J. Gallagher (Doc. 350) is DENIED as MOOT.

IT IS FURTHER ORDERED THAT Class Counsel and Western Union shall CONFER and Class Counsel shall PREPARE a Proposed Order awarding Counsel's requested fees, costs, and incentive payments for the Court's signature.  The Proposed Order shall be filed in the normal course in the Court's CM/ECF filing system and submitted in editable formal to the Kane Chambers email account.  The Proposed Order is due on or before October 4, 2014.  Counsel are congratulated on jobs exceedingly well

done.

Dated October 15, 2014, *nunc pro tunc* to September 23, 2014.

 

**s/John L. Kane**
SENIOR U.S. DISTRICT JUDGE

11

Appellate Case: 14-1432     Document: 01019356384     Date Filed: 12/15/2014     Page: 128

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
### Judge John L. Kane

Civil Action No. 09-cv-00938-JLK consolidated with No. 10-cv-00765-JLK

**JAMES P. TENNILLE**, **ROBERT SMET**, **ADELAIDA DELEON AND YAMILET RODRIGUEZ**, individually and on behalf of all others similarly situated,

     Plaintiffs,

v.

**THE WESTERN UNION COMPANY** and **WESTERN UNION FINANCIAL SERVICES, INC.**,

     Defendants.

---

## ORDER

---

Kane, J.

     This matter comes before the Court on Plaintiffs' Motion of Class Counsel for Approval of Attorneys' Fees, Costs and Expenses and for Approval of Incentive Awards (Doc. 195). For the reasons set forth in this Court's September 23, 2014 Order Modifying Magistrate Judge's Recommendation re Attorney Fees (Doc. 363), the Motion is GRANTED. The Court found at the Fairness Hearing that approximately $135,239,199.14 will be deposited into the Class Settlement Fund. (Amended Final Judgment and Order of Dismissal ("Amended Final Judgment," Doc. 256) ¶ 13; Declaration of Nicki Orr (Doc. 248) at Ex. 1.) Accordingly, it is HEREBY ORDERED:

     1.     Class Counsel shall be paid $40,571,759.70 out of the Class Settlement Fund pursuant to Paragraph 5.A of the Stipulation and Agreement of Compromise and

Settlement ("Settlement Agreement," Doc. 172-2) and Paragraph 1 of the Amended Final Judgment.

2.      Each Class Representative—James Tennille, Robert Smet, Adelaida DeLeon, and Yamilet Rodriguez— shall be paid $7,500.00 out of the Class Settlement Fund pursuant to Paragraphs 4.A and 4.C of the Settlement Agreement and Paragraph 1 of the Amended Final Judgment.

3.      The Class Settlement Fund shall be funded, and Class Counsel and Class Representatives shall be paid out of the Class Settlement Fund, in the time and manner set forth in the Settlement Agreement.

DONE AND SIGNED this 15th day of October, 2014.

BY THE COURT:

**s/John L. Kane**
SENIOR U.S. DISTRICT JUDGE

65726-0012/LEGAL123687010.1